199 P.2d 125

**STATE v. PELOSI et al.**

No. 981.

Supreme Court of Arizona.

Nov. 8, 1948.

52

Whitney, Ironside & Whitney and Leslie C. Hardy, all of Phoenix, for appellants.

Evo De Concini, Atty. Gen., Perry M. Ling, Chief Asst. Atty. Gen., and Edward Jacobson, Asst. Atty. Gen., for appellee.

LA PRADE, Justice.

This is an appeal from judgments pronounced and entered in the superior court of Maricopa County following verdicts of a jury finding appellants guilty of violating chapter 85, Session Laws 1945 (section 73-1607a Cum. Pocket Supp. Ariz. Code 1939), which provides as follows:

"73-1607a. Penalty.—All forms of wagering or betting on the result of a horse-race or dog-race, except as provided by law, whether conducted in this state or elsewhere, shall be illegal. Any person directly or indirectly involved in such wagering or betting whether in placing or making a bet or wager for himself or as a book-maker shall be guilty of a misdemeanor."

The information charged appellants jointly in thirty separate counts of violating the above statute. The first count is typical of all the counts of the information. It charges as follows:

"The said Frank Pelosi, Joe Dean Davis and Irvin Kaslow on or about the 2nd day of December, 1946, * * * did then and there wilfully and unlawfully wager and bet on the results of a horse race, to-wit; did accept, take and receive as a bookmaker, the sum of One ($1.00) Dollar from one John E. Thomson, as a wager upon a horse named 'Fire Power' further designated by the defendants as number 429, entered in a race to be run on that day at Tropical Park race track in the State of Florida, in violation of Section 73-1607a, A.C.A.1939; * * *"

The several counts have their origin in bets made by John E. Thomson on nineteen days in December and eleven days in January. Mr. Thomson testified that he had been employed by the attorney general to investigate the establishment of appellants to secure evidence as to its unlawful operation. Relying on information secured, the attorney general, on January 14, 1947, filed a complaint, in behalf of the state, in the superior court of Maricopa County, seeking to abate as a public nuisance the gambling house maintained by appellants. A temporary restraining order was requested and issued, enjoining and restraining appellants from conducting or permitting the continuance of the nuisance on the premises referred to in the complaint. These premises are in the block directly across from the county courthouse. Three of the sheriff's deputies, accompanied by the attorney general, three of his assistants, and several newspaper reporters and photographers, proceeded to the premises to serve the temporary restraining order. Deputy Sheriff LaMore entered the premises first and served the restraining order upon Mr. Pelosi, who was engaged in "calling" the progress of a race for the benefit of 35 or 40 patrons present. Mr. LaMore at this time took possession of a money bag into which he had seen Mr. Pelosi insert cur-

rency and papers. With reference to conversation concerning taking the bag without first inventorying its contents, Mr. LaMore testified: "He (referring to Pelosi) said 'It is locked. We won't worry about that. It is all right. I got the key. You got the bag.' I said 'That is good enough for me.'" "Scratch sheets" and other paraphernalia were gathered up and taken away. The newspaper photographers took pictures of the interior of the building, depicting the walls, tables, telephones, etc. Mr. LaMore further testified that while Mr. Pelosi was reading the temporary restraining order one of the patrons of the place approached him with money in his hand and attempted to place a wager.

At the time of arrest of appellants, the officers were not in possession of a warrant of arrest for any of appellants nor of any search warrant for the premises. Appellants, prior to trial, filed a petition to return and suppress the use of all the evidence claimed to have been unlawfully seized at time of arrest, which was denied. Over objection of appellants, all paraphernalia that had been seized, the money bag, and the photographs were admitted in evidence. Counsel for the state and the court requested of counsel for appellants that the key to the locked money bag be produced, which request was not acceded to, appellants making the objection that to force them to produce the key would be to compel them to give incriminating testimony. Thereupon the court directed the clerk of the court to cut the bag open, and the contents, consisting of a large packet of bills and some coins, were exhibited to the jury.

Prior to trial a motion to quash the information was filed and denied. The case was tried before a jury composed of men and *women*. After verdicts of guilty had been returned, appellants filed a motion for a new trial and a motion in arrest of judgment, both of which were denied.

To secure a reversal of the judgments appellants have made six assignments of error, supported by appropriate propositions of law, which will be considered in the order presented. The information and each count thereof is challenged upon the ground that it does not charge the commission of an offense.

The first contention is that it is the placing or making of a bet or wager *on the result* of a horse race *conducted* within or without the State of Arizona that is illegal under section 73-1607a, supra. It is argued that the offense cannot be completed unless the race is "conducted," meaning, of course, that the race upon which the wager or bet is made must be run, and that the words "result" and "conducted" employed in the statute are indispensable in determining when the offense denounced by the statute is committed.

Each count of the information alleges that appellants "did accept, take and receive as a bookmaker * * * as a wager upon a horse * * * entered .in a

race *to be run* * * *." (Emphasis supplied.) Appellants contend that the allegation that a wager or bet was made upon a race "to be run" falls short of the statute which makes it a criminal offense only when the wager or bet is made "on the result" of a horse race which is "conducted." The interpretation contended for is that there must be a completed race coupled with a bet or there is no offense, and that the winning or losing of money is the evil sought to be suppressed. We think that the evil sought to be suppressed is wagering and betting and not the winning or losing of a stake. The offense is "all forms of wagering or betting." It is the wager or bet which is illegal and it is immaterial that the race is never run. Certainly no bets would be made after the race had been run. Gambling is carried on even before the showdown in a card game; before the winner is determined the participants have been gambling. 38 C.J.S., Gaming, § 81.

The second objection to the information is to the effect that it is the placing of a bet rather than the receiving of a bet that is prohibited. It is true that the offense denounced by the statute is "in placing or making a bet or wager." The information alleges that the appellants "did accept, take and receive, as a bookmaker, the sum of One ($1.00) Dollar * * * as a wager * * *." A bookmaker when he receives a bet, or accepts a bet, or takes a bet, must of necessity *make* a bet. In overruling the motion to quash the information, the trial court was not extending the meaning of the language of the statute to include all acts cognate to those actually condemned. Counsel for appellant suggest that if we hold that the receiving of a bet necessarily implies the making of a bet we are thereby creating a constructive crime by the aid of inference and implication, such as was denounced in State v. Behringer, 19 Ariz. 502, 172 P. 660. It is not necessary that an information be in the exact language of the statute. It is sufficient if it contains language of the same import. Gutierrez v. State, 44 Ariz. 114, 34 P.2d 395. The interpretation contended for is repugnant to the spirit and letter of the statute.

The second and third assignments complain of the ruling of the trial court denying the petition to return and suppress the use of the evidence allegedly unlawfully seized. By these assignments appellants assert that the seizure of the exhibits and their introduction in evidence was in violation of the following provisions of our State Constitution:

Art. 2, Sec. 4. "No person shall be deprived of life, liberty, or property without due process of law."

Art. 2, Sec. 8. "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

Art. 2, Sec. 10. "No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense."

It is asserted that the search and seizure had its inception in the issuance and service of the temporary restraining order in the civil action, and that the arrest and prosecution was for misdemeanor offenses *not* committed in the presence of any of the arresting officers. Appellants lose sight of the fact that at the time of arrest they were committing an offense in the presence of the officers, to wit, maintaining a public nuisance. A horse-race-betting establishment such as was maintained and operated in the presence of the arresting officers is a public nuisance within the meaning of section 43-4603, A.C.A.1939, and declared to be a misdemeanor and punishable as such. Engle v. State, 53 Ariz. 458, 90 P.2d 988; Engle v. Scott, 57 Ariz. 383, 114 P.2d 236. A peace officer may without a warrant arrest any person who commits a misdemeanor in his presence. Section 44-124, A.C.A.1939; Adair v. Williams, 24 Ariz. 422, 210 P. 853, 26 A.L.R. 278. The arresting officer went to the premises to serve a civil process, which it was his right and duty to do, and was in no sense a trespasser. It was also his right and duty to at that time and place arrest any person committing any criminal offense in his presence. "It is well settled that a search without a search warrant is justifiable where it is incident to a lawful arrest, and a seizure, on such a search, of evidence related to the crime, as well as the instruments of its commission and of means and implements of escape, is likewise permitted on such a search." 56 C.J., Searches and Seizures, section 90, page 1198. The search and seizure having been lawful, we see no merit in the contention that the constitutional provisions referred to were violated. The property of appellants was not taken without due process of law, nor were they disturbed in their private affairs without authority of law. It is true that they were not prosecuted for the offense for which they were arrested, but evidence lawfully seized if otherwise competent is admissible to prove any offense of which they might have been charged. Adkins v. State, 42 Ariz. 534, 28 P.2d 612.

Under the rule laid down in State v. Frye, 58 Ariz. 409, 120 P.2d 793, the admissibility of evidence is not affected by the fact that it was obtained as a result of a violation of the Fourth Amendment to the Federal Constitution. Article 2, section 8 of our Constitution, to the effect that no person shall be disturbed in his private affairs or his home invaded without authority of law, was adopted for the purpose of preserving the rights which the Fourth Amendment to the Federal Constitution was intended to protect. If the seizure itself is proper and if the articles seized are legal as evidence to prove the offense charged, they will not be rejected because of the privilege against self-incrimination. This is well stated in People v. Chiagles, 237 N.Y. 193, 142 N.E. 583, 585, 32 A.L.R. 676, where Justice Cardozo said:

" * * * This much at least is certain. When the things received in evidence are

the fruits of lawful search, the claim of privilege is hollow. (Citing cases.) Search would be mere futility if what is found could not be used."

We think that there is no merit in appellants' contention that they were compelled to give evidence against themselves. The money bag was lawfully seized. The rule is that "The search may extend to the contents of a package, bundle, or bag carried by the person arrested. (Citing cases.)" Haverstick v. State, 196 Ind. 145, 147 N. E. 625, 627.

■■■■■ The fourth assignment of error challenges the constitutionality of chapter 85, Session Laws 1945 (section 73-1607a, supra) upon the ground that this act in fact and substance amends sections 73-1605 and 73-1607, A.C.A.1939. The first of these sections reads as follows, the second relates to the penalty and is not quoted:

"73-1605. *Parimutuel machines—Revenue.*—The use of parimutuel machines at racing meets held as herein provided is hereby authorized, under rules and regulations to be prescribed by the commission. The commission shall receive 4 per cent, of all moneys received from parimutuel sales, for the privilege of conducting such machines and the owner and/or operator of such machines shall receive 9%. The collection of such fee to be paid the commission shall be made each day after the conclusion of the races and shall be in addition to any license or other charge that may be made by state or local authorities for con-

ducting said racing meet. For the purpose of ascertaining the amount of the fee the commission or its agents shall have access to all such machines and to the books and records connected therewith or related to the operation thereof. *All other forms of wagering or betting on the result of a horse race or dog race shall be illegal, when conducted on the premises of such racing track.*" (Emphasis supplied.)

The contention made is that chapter 85 contravenes article 4, part 2, section 14 of the State Constitution which provides:

"No act or section thereof shall be revised or amended by mere reference to the title of such act, but the act or section as amended shall be set forth and published at full length."

It is insisted that chapter 85 amends the section referred to by intermingling new and old provisions and, as a consequence, must be regarded as amendatory of these sections, this notwithstanding that it professes to be complete in itself and does not purport to amend any prior act. Our attention is directed to Sutherland's Statutory Construction, 3rd Edition, section 1921, which in part reads:

"An act which does not purport to amend a prior act and which is 'complete within itself' is not an amendment within the scope of the constitutional provision, although it may modify or alter some existing statute. Other cases have secured the same result by using such terms as 'substi-

tute' legislation, or 'independent' act. In many cases the phrase 'complete and independent' provides the justification.

"A statute is said to be complete within itself when it is not necessary to refer to any other statute to understand its scope or meaning. But it has been held that an act is complete within itself *although it adopts by reference the provisions of an existing statute, and reference thereto is necessary to determine what substantive rights or duties it creates or to determine what procedure is provided for its execution. * * *"* (Emphasis supplied.)

Counsel for appellants lay stress upon the first sentence of the second paragraph of this text which seems to indicate that the general rule is that "A statute is said to be complete within itself when it is not necessary to refer to any other statute to understand its scope and meaning." The point made is that section 73-1607a (chapter 85) prohibits all forms of wagering or betting on the result of a horse or dog race *"except as provided by law."* Appellants insist that in order to ascertain whether a horse-race bet is legal or illegal it is necessary to have recourse to other sections of the law. To support this argument reference is made to Southern Pac. Co. v. Bartine, C.C., 170 F. 725 and Warren v. Crosby, 24 Or. 558, 34 P. 661. In the Bartine case it is said [170 F. 740]:

"In order to understand the statute in question, it is unnecessary to compare it with former laws on the same subject. Its terms are plain and complete in themselves; they can be understood and executed *without referring to previous legislation.* * * *"* (Emphasis supplied.)

In the Crosby case the rule is stated as follows [24 Or. 558, 34 P. 662]:

"* * * Hence an act of the legislature, not amendatory in character, but original in form, and complete in itself, *exhibiting on its face what the law is to be,* its purpose and scope, is valid, notwithstanding it may, in effect, change or modify some other law upon the same subject." (Emphasis supplied.)

Prior to enactment of section 73-1605 (chapters 79, Laws 1935) gambling on horse races was not prohibited. Engle v. State, supra. This section was enacted primarily as a revenue measure, O'Neil v. Arizona Horsemen's Ass'n, 57 Ariz. 424, 114 P.2d 894, and authorizes the use of parimutuel machines at horse and dog races. It does not legalize this type of gambling for the reason that it had not been prohibited theretofore. In the last sentence of the section it is prescribed that all other forms of wagering or betting on the result of a horse or dog race are illegal "when conducted on the premises of such racing track." This was the first prohibition to be found in our statutes against betting on horse or dog races. Chapter 85 does not refer to any of the provisions of article 16 (sections 73-1601 to 73-1608, in-

clusive) by title or otherwise and is not amendatory of the sections referred to. It prohibits all forms of wagering or betting on horse or dog races except as theretofore provided. It acknowledges and takes cognizance of the fact that betting through parimutuel machines where licensed is lawful and that such betting is not violative of this all-prohibitory act. The exception "except as provided by law" is equivalent to the adoption of another statute by reference. In State v. Roseberry, 37 Ariz. 78, 289 P. 515, 517, the court had before it for consideration the effect of an enactment which authorized the garnishment of salaries and wages of public officials, and to make the statute workable, the general procedural provisions in garnishment were adopted by reference. The contention was made that the making of these procedures applicable to garnishment of salaries and wages of public officials or employees contravened article 4, part 2, section 14 of the Constitution—the same contention made here. The court said:

"* * * All chapter 50 (Laws 1929) did was to create another class of garnishees. * * * The general procedure in garnishment was adopted by reference. That the adoption by reference of another existing legislative act does not contravene said provision of the Constitution has been decided at least three times by this court. Clements v. Hall, 23 Ariz. 2, 201 P. 87; In re Altman, 26 Ariz. 635, 229 P. 388; Scottish Union & National Ins. Co. v. Phoenix Title & Trust Co., 28 Ariz. 22, 235 P. 137."

All that chapter 85 did was to extend the area in which betting or wagering on horse or dog races was prohibited "except as provided by law". The legislation in question is complete in itself, has no tendency to mislead or deceive, and in our judgment does not violate the constitutional provision by acknowledging and taking cognizance of the fact that in one instance betting or wagering on horse or dog races is lawful. See Jones v. Dexter, 8 Fla. 276, and cases cited under Note 6, Sutherland's Statutory Construction, 3rd Edition, section 1921.

Proposition of law in support of assignment No. 5 suggests that section 73-1607a amends sections 43-2701 to 43-2705 (anti-gambling statutes referred to and adopted by the people) and as a consequence is in violation of article 4, part 1, section 1, subsection 6 of the Constitution, which provides that the power of the legislature to repeal or amend shall not extend to initiative or referendum measures approved by the qualified electors of the state. Appellants say:

"Our position is that only such gaming, as is defined by the referendum measure adverted to, is prohibited by such referendum measure and that the addition of another form of gambling other than that specified in said referendum measure, is in effect an amendment of the gambling statutes by the addition of another form of gambling without submitting the question to a vote of the people as provided by the Constitution of Arizona."

The legislative authority of the state is vested in the state legislature, article 4, part 1, section 1, Arizona Constitution; however, in this article the people reserved to themselves (1) the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the poles; and (2) the power to approve or reject at the poles any act, or item, section, or any part of any act, of the legislature. Section 43-2701 and 43-2705, supra, were enacted by the legislature and referred to and approved by the people, and having been approved by the people the legislature is without power to repeal or amend these measures. These referred measures prohibit specified types of gambling, and those types of gambling not enumerated are not prohibited. Engle v. State, supra. These antigambling statutes and chapter 85 were enacted under the police power of the state. This police power is an inherent attribute of sovereignty, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society within constitutional limits. American Federation of Labor v. American Sash & Door Co., 67 Ariz. 20, 189 P.2d 912, 920. It is not necessary to cite any authority to demonstrate that the people or the legislature in enacting laws regulating or prohibiting gambling are resorting to their police power.

We have not been cited to, nor do we know of, any provision of the Constitution which precludes the people or the legislature from enacting laws regulating or prohibiting gambling of type C because they have theretofore enacted laws regulating or prohibiting gambling of types A and B. Would the legislature be precluded from enacting quarantine regulations affecting persons afflicted with leprosy because they had theretofore enacted quarantine laws affecting persons infected with smallpox or diphtheria? The mere propounding of the question suggests the answer. In the American Federation of Labor case, supra, which was concerned with the constitutionality of the so-called "right-to-work" amendment to the Arizona Constitution, the contention was made that the amendment was unconstitutional on the ground that it constituted class legislation and was discriminatory in that it purported to protect nonunion members in their right to secure and retain employment, and neglected to insure the same right to union members. We pointed out that the amendment was adopted as a police regulation and was not subject to the criticism leveled against it, giving as our reason that the people in enacting the amendment were not required to encompass "in one constitutional amendment a corrective for all the evils which may or do arise in the field of employer-employee relations." In that same case we quoted with approval from N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, the following statement of the rule:

"* * * We have frequently said that the legislative authority, exerted within its proper field, need not embrace all the evils within its reach. The Constitution does not forbid 'cautious advance, step by step,' in dealing with the evils which are exhibited in activities within the range of legislative power. * * *"

With this statement of the law we again concur and the rule therein announced is determinative of the objection here made. There is no merit to the contention that the legislature by attacking a new and different type of gambling than those prohibited in the enacted and referred measures was thereby amending those measures.

Appellants' 6th assignment of error challenges the constitutionality of chapter 50, Session Laws 1945, purporting to amend sections 37-101 and 37-102, A.C.A.1939. Prior to amendment, section 37-101 provided that grand juries, trial juries, and juries of inquest should be composed of *men*. Section 37-102, prior to amendment, prescribed the qualifications of jurors, grand and petit, one of which was that each should be a "male citizen." By the amendment, the word "men" in section 37-101 was changed to "persons," and in section 37-102 the word "male" was eliminated and the following paragraph added:

"Any woman shall be exempt from jury duty by requesting her name be stricken from the jury list. Such request shall be in writing and placed on file with the county board of supervisors. The clerk of the board shall prepare a certified list of the persons filing such statements, and deliver the same to the clerk of the superior court, who shall file the same. A person failing to file such statement shall not be exempt from jury service."

The contention is that chapter 50 is unconstitutional for the reason that the exemption provision was not expressed in the title, consequently the chapter violates article 4, part 2, section 13 of the Constitution which reads as follows:

"(Title)—Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

The title of chapter 50 as enacted reads as follows:

"An Act Relating to Juries; Prescribing the Kinds of Juries and the Qualifications of Jurors; Amending Sections 37-101 and 37-102, Arizona Code of 1939, and Declaring an Emergency."

Appellants insist that the exemption provisions of said chapter being void the jury was not summoned, selected, and empaneled according to law, and that they did not receive a constitutional trial by a jury constituted according to law, and were deprived of their liberty without due process of law in violation of article 2, section 4

of the State Constitution and the 14th Amendment to the Federal Constitution.

 The constitutional provision that every legislative enactment shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title, has been considered by this court in numerous cases. See annotations to the constitutional provision. We quote the following brief statements of the rule developed in these cases:

"The rule is established in this jurisdiction that any provision directly or indirectly relating to the subject expressed in the title, having a natural connection with and not foreign thereto, is embraced within it. (Citing cases.)" Valley National Bank of Phoenix v. Glover, 62 Ariz. 538, 159 P.2d 292, 297.

"We consider next the objection that the title of the act is not sufficiently broad. We have discussed the nature and purpose of this provision in many cases and have uniformly held that its purpose was to prevent the inclusion of subjects in an act which might not reasonably be expected to be found therein under the title; that it would be given a liberal construction and not a narrow and constrained one for the purpose of nullifying legislation, and that it did not need to be a synopsis or complete index of the subjects found in the act, but that any provision directly or indirectly relating to the subject expressed in the title, having a natural connection with and not

being foreign thereto, was proper." State v. Versluis, 58 Ariz. 368, 120 P.2d 410, 414.

Again in Board of Control v. Buckstegge, 18 Ariz. 277, 158 P. 837, 840 (reaffirmed in Taylor v. Frohmiller, 52 Ariz. 211, 79 P.2d 961) the rule was stated in this language:

"By confining the legislation to the subject contained in the title, neither the members of the Legislature nor the people can be misled to vote for something not known to them or intended to be voted for.

"This provision of the Constitution does not require that the title of an act should minutely and in great detail describe the legislation proposed; it is not necessary that the title be a synopsis or a complete index to the legislation. The title of the act, however, should be sufficiently full and comprehensive as to indicate, in a general way at least, what is to follow in the way of legislation. It should not be so meager as to mislead or tend to avert inquiry into the contents thereof. * * *"

Counsel for the state argue that the exemption of jurors is indirectly related to the subject matter expressed in the title, namely, "An Act Relating to Juries," and has a natural connection with the title, and is not foreign thereto within the rules expressed in the foregoing cases. This argument, we believe, is sapped of its potency when it is observed that the title of chapter 50 pinpoints the legislation that is to follow. The phrase "An Act Relating to Ju-

ries" standing alone is sufficiently broad to authorize any legislation relating to juries, but it is circumscribed by the next phrase "Prescribing the Kinds of Juries and the Qualifications of Jurors," which latter phrase is further circumscribed by the phrase "Amending Sections 37-101 and 37-102, * * *." This title in reverse indicates that sections 37-101 and 37-102 are being amended—that the sections to be amended relate generally to juries and more specifically to kinds of juries and their qualifications.

In Taylor v. Frohmiller, supra, the court was considering an act bearing the title "An Act Relating to Unemployment Compensation, and Amending Sections 3, 4, 5, 6, 7, 12, 18, 19, and 22 [Laws 1936, First Sp.Sess., c. 13], * * *." Laws 1937, c. 68. In the body of the act, section 10 was amended whereas it was not disclosed in the title that section 10 was being amended. With reference to this situation the court said [52 Ariz. 211, 79 P.2d 964]:

"* * * *Had the title of the act stopped at the first comma,* it would have been broad in its scope, and one who read the title would have been advised thereby that any matter relating to unemployment compensation might be found in the body of the act. But the title further states that it is amendatory of certain named sections of a certain specified act. *We think the natural reaction of one who read the title would be that the only portions of chapter 13 which were to be amended were the particular sections set forth in the title of the act and that he would be led to believe that any amendments to be made to chapter 13 contained nothing which was not germane to the matters dealt with in the sections named.* * * *"* (Emphasis supplied.)

In Valley National Bank of Phoenix v. Glover, supra, this court had for consideration the following title:

"An Act Relating to Veterans; Providing That Minority Shall Not Be a Legal Disability in Receiving Servicemen's Benefits; and Declaring an Emergency." Laws 1945, c. 48.

The same constitutional objection contended for here was raised against this title. The trial court had theretofore overruled the objection of unconstitutionality and held that the minors were under no disability in receiving servicemen's benefits under the contracts and mortgages before the court, and further that minors were under no disability by reason of minority to make any *other* contracts regarding their community or separate property or otherwise. The judgment on appeal was affirmed insofar as it held that minors were under no disability to make contracts directly or indirectly relating to or having any connection with the receiving or enjoyment of servicemen's benefits, but that portion of the judgment was modified that relieved minors of any disability by reason of minority as to their contracts *not* related to the receiving of benefits under the Serv-

icemen's Readjustment Act, 38 U.S.C.A. § 693 et seq. The court, speaking through Justice Morgan, came to this conclusion by the following rationale: " * * * In determining the extent and operation of the act we have to consider not only the law itself but its title. The title begins with the words 'Relating to veterans' *and then proceeds to qualify this general provision by the following, 'providing that minority shall not be a legal disability in receiving servicemen's benefits.' It is our view that the last-mentioned provision limits the operation of the act to matters coming within its purview.* The act itself provides that a veteran or his spouse shall be under no legal disability by reason of minority to make 'any contract nor shall any contract made by any such veteran or spouse be invalid or voidable' by reason of minority. It seems obvious to us that under the limitation contained in the title that the contracts mentioned must be confined to those which grow out of or result from benefits which may be received by servicemen. It cannot be construed as a general removal of minority disability of the veteran or the spouse. This construction is in accordance with the decisions of this court. Taylor v. Frohmiller, 52 Ariz. 211, 79 P.2d 961; Board of Control v. Buckstegge, 18 Ariz. 277, 158 P. 837."

The titles considered in these two cases for all intents and purposes are almost identical with the title now under consideration, and we think the opinions conclusively demonstrate that the opening phrase of the title "An Act Relating to Juries" is qualified by the subsequent phrases in the title. The following quotation from Taylor v. Frohmiller, supra, is most apt:

" * * * when it appears from the title of the act that certain specific provisions of another act are to be amended, the body of the amending act may contain only matter which is reasonably germane to the subject matter of the sections which *are stated by the title to be the subject of amendment, and may not go to the extent of amending sections not named in the title* and which refer to matters not naturally connected with the subject matter of the particular sections which are to be amended. * * *" (Emphasis supplied.)

The two sections that were amended had nothing to do with exemptions of jurors which had been specifically provided for in section 37-104. The editors of Corpus Juris Secundum under the general title of "Juries" have a separate subhead entitled "Qualifications and Exemptions." 50 C.J. S., Juries, page 707. Under section 153b, Id., it is said:

"Exemption from jury duty is a personal privilege which a juror may claim or waive. An exemption from jury duty is not a disqualification to act as a juror but is a mere personal privilege which the juror may claim or waive, * * *."

A juror otherwise qualified may waive his exemption and serve. There are many

statutory attributes for qualification and disabilities for disqualification, none of which is of any consequence or a proper subject for consideration when considering statutory grants of exemptions. The body of the amending act may contain only matter which is reasonably germane to the subject matter of the sections stated by the title to be the subject of amendment, which in this case was qualifications and not exemptions.

■ We therefore conclude that the second paragraph of section 37-102 as amended embraces subject matter not included in the title and is violative of the constitutional provision which also provides that "such act shall be void only as to so much thereof as shall not be embraced in the title." The exemption paragraph added to 37-102 is not so inter-related to the provisions of section 37-101 or the first paragraph of 37-102, as amended, as not to be severable. By holding that the second paragraph of section 37-102, as amended, allowing women to exempt themselves from jury duty is unconstitutional, the remainder of chapter 50 is not emasculated, and is effective for the purposes for which enacted. The question as to whether the legislature may constitutionally grant women the privilege of exemption from jury service upon request is not before us. In considering the assignment just treated we have concerned ourselves solely with the proposition that the legislative method followed in attempting to extend the exemption was contrary to the Constitution.

■ We shall now consider appellants' proposition that the exemption provisions of chapter 50 being void the jury summoned, selected, and empaneled was not a jury summoned, selected, and empaneled according to law, and that as a consequence they did not receive a constitutional trial and were deprived of their liberty without due process of law. Section 37-106 directs the board of supervisors, at its regular meeting in January, following each biennial general election, to cause a list to be made of *all persons within the county qualified to serve as jurors* and to certify the list to the clerk of the superior court, who is directed to place the name of each person certified on a small piece of paper and drop it in a "jury box." Other provisions provide for the drawing from the jury box of a jury panel. In January, 1947, the board of supervisors, in an endeavor to comply with provisions of section 37-106, certified to the clerk of the superior court the names of some 84,000 citizens, men and women, who were registered to vote. After the effective date of the act authorizing women to exempt themselves, March 9, 1945, several thousand women in Maricopa County took advantage of the provision and filed claims of exemption with the board of supervisors. In May, 1947, preceding the trial of appellants in June, 1947, the judge of the superi-

or court ordered a panel of 300 jurors drawn. When the 300 names were drawn, 130 of which were women, it was discovered, by checking against the list of claimed exemptions, that 23 of the 130 women had claimed exemption. These 23 names were stricken from the list of 300 and the remaining 267 names were delivered to the sheriff to serve. The sheriff's return showed that he was able to find and serve only 103, of which 33 were women. The record does not disclose how many of the 103 summoned were excused by the court at the time they reported, but presumably some of them were. In any event at the trial of appellants the names of 24 jurors were drawn from the clerk's jury box, 12 of which were women. Appellants' counsel struck five of the women on peremptory challenge and the state one, leaving six women and six men who constituted the trial jury. If chapter 50 had not been enacted, the 23 names of women claiming exemption would not have been deleted and it is possible that the sheriff would have been able to serve approximately one-fourth of them. The practical effect of the procedure followed resulted in there possibly being six fewer women on the entire jury panel to try cases in five divisions of the court.

In Lawrence v. State, 29 Ariz. 247, 240 P. 863 (petition for rehearing denied 29 Ariz. 318, 241 P. 511), it appeared that the clerk of the board of supervisors should have certified to the clerk of the superior court a list of more than 17,000 names of qualified jurors, whereas he certified only 6,000. The trial court disallowed a challenge to the panel for this delinquency. On appeal it was held that it was error for the trial court to have disallowed the challenge, but the conviction was sustained on the ground that the defendant had not shown that he had been prejudiced by failure to have the jurors drawn from a list containing 17,000 names rather than a list of 6,000. In Midkiff v. State, 29 Ariz. 523, 243 P. 601, this court approved of its holding in the Lawrence case and further pointed out that the list of qualified jurors required to be certified by the clerk of the board of supervisors, which ordinarily would include many thousands of names, is not especially for the benefit of any litigant, but rather to distribute the burdens of jury duty over the whole citizenry.

It affirmatively appears from the record that the jurors who actually tried the case were fair and impartial. They were all legally qualified to serve, and were drawn in accord with every form of law from a jury list certified by the proper authority. The only irregularity that occurred was the omission from the list to be served of the names of 23 women who had been allowed an exemption under what we now determine to be an unconstitutional law. This irregularity was inconsequential when upon

68

the whole case it appears that substantial justice was done.

No legal reasons appearing to justify a reversal of the judgments they are accordingly affirmed.

STANFORD, C. J., and UDALL, J., concur.