IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

|  |  |  |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | 2 CA-CR 2006-0079 |
| Appellee, | ) | DEPARTMENT B |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| LEMON MONTREA JOHNSON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. CR-20021357

Honorable Ted B. Borek, Judge

AFFIRMED

---

Terry Goddard, Arizona Attorney General
  By Kent E. Cattani and Joseph L. Parkhurst

Tucson
Attorneys for Appellee

Robert J. Hirsh, Pima County Public Defender
  By M. Edith Cunningham

Tucson
Attorneys for Appellant

---

B R A M M E R, Judge.

¶1        In *State v. Johnson*, 217 Ariz. 58, ¶ 27, 170 P.3d 667, 673 (App. 2007)

(*Johnson I*), we determined a police officer's pat-down search of appellee Lemon Johnson

violated the Fourth Amendment.  We reasoned the search was improper because the initially lawful seizure of passenger Johnson "incident to a traffic stop of the driver [had] evolved into a separate, consensual encounter."  We so reasoned because Johnson would have felt free to remain in the vehicle rather than get out to continue his conversation with the officer, and her questioning of him was unrelated to the reason for the traffic stop.  *Id.*  Our supreme court denied the state's petition for review of our decision.

¶2       The United States Supreme Court reversed, determining the encounter was not consensual because the initial seizure had not ended.  *Arizona v. Johnson*, ___ U.S. ___, 129 S. Ct. 781, 788 (2009) (*Johnson II*).  The Court also determined that, because passengers in a stopped vehicle are lawfully seized, officers may, consistent with the Fourth Amendment, perform a pat-down search of such a passenger absent a suspicion of criminal activity if the officer had a reasonable suspicion the passenger was armed and dangerous.  *Id.* at 787.  The Court remanded the case to this court for further proceedings, including determining if the officer reasonably suspected Johnson was armed and dangerous.  *Id.* at 788, 788 n.2.

¶3       Because we conclude the officer's pat-down search was constitutional, the trial court did not err in denying Johnson's motion to suppress evidence discovered in that search. We also reject Johnson's arguments that the reasonable doubt instruction the court gave was structural error and that the court's finding of prior convictions violated his right to a jury trial.  We therefore affirm Johnson's convictions and sentences.

2

**Factual and Procedural Background**

¶4   When reviewing the denial of a motion to suppress, "we consider only the evidence presented at the suppression hearing and view that evidence and reasonable inferences therefrom in the light most favorable to upholding the court's ruling." *State v. May*, 210 Ariz. 452, ¶ 4, 112 P.3d 39, 41 (App. 2005). We set forth the factual background in our previous opinion as follows:

> Oro Valley Police Officer Maria Trevizo, on assignment with the state gang task force, was on patrol in Tucson with two other officers at approximately 9 p.m. on April 19, 2002. The officers were in an area in which "[d]irectly to the west . . . [is] a neighborhood known as Sugar Hill . . . that is a gang-related area." Trevizo testified Sugar Hill is associated with the Crips gang, and members of that gang wear blue apparel. Trevizo also noted that "gang members will often, in general, possess firearms."
>
> An officer in Trevizo's vehicle "r[a]n the license plate of a vehicle" and found it had a "mandatory insurance suspension."[FN1] Trevizo and the other officers in the vehicle "were not investigating gang activity as part of the traffic stop" and were not "targeting [the vehicle] for [their] gang task force function." They also "[did not] know where [the car had] been . . . [and did not] know where it [was] going." The officers had seen no behavior in the vehicle "indicative of criminal activity."
>
>> FN1. Trevizo stated a mandatory insurance suspension occurs when "the Motor Vehicle[] Department has suspended the registration . . . for an insurance-related purpose . . . . Sometimes people will get a ticket for [not having] insurance and not pay it, or sometimes they've been cited multiple times for not having insurance. There's different reasons." According to Trevizo, it "is a ticketable offense" and "[a] civil citation" but

3

does not "bring concern with regard to criminal activity."

Johnson was sitting in the rear of the vehicle, with the driver and another passenger in the front seats. Trevizo stated she had no "reason to believe that [Johnson] was engaged in criminal activity or about to engage in criminal activity when [she] made the traffic stop." Johnson "looked back [at the officers], said something to the people in the front, and then continued to look back at [the officers] while [they] initiated the stop." Trevizo testified this was unusual conduct for an occupant of a vehicle being stopped, and it made her nervous. One officer spoke to the driver and "at some point . . . asked everybody to put their hands where he [could] see them." He asked whether any of the men in the car had weapons and all the occupants said no. The officer also had the driver exit the vehicle to get "his basic information: driver's license, registration, insurance."

Trevizo examined Johnson for seven indicia of gang affiliation.[FN2] Johnson was dressed entirely in blue, and had a blue bandanna. Trevizo testified that bandannas are often used "to show . . . allegiance or . . . affiliation with a certain gang" and that the only indicator she saw was Johnson's blue clothing. The driver of the car, however, was wearing red clothing.

> FN2. Trevizo testified the "seven basic . . . criteria to determin[e] if somebody is a gang member" are: 1) the colors the person is wearing, 2) tattoos, 3) gang signs, 4) self-proclamation of membership, 5) particular jewelry that might be associated with gangs, 6) photographs, and 7) "correspondence between gang members."

Trevizo said she was "concern[ed]" because Johnson had "a scanner in his jacket pocket," which people normally do not have "unless they're going to be involved in some kind of criminal activity or going to try to evade police by listening to the scanner." It was the first time Trevizo had seen anyone "carry [a scanner] on their person." According to her, "[t]here's

4

nothing illegal about [having a scanner]," but "it's out of the ordinary." Trevizo did not know whether the scanner was turned on or off.

Trevizo began to talk with Johnson, who was still in the vehicle. He was cooperative and told her his name and date of birth but said he did not have any identification on him. He said he was from Eloy, and Trevizo testified there is a "predominant gang [there] called the Trekkle Park Crips." Trevizo asked Johnson if he had spent any time in prison, and Johnson responded that "he had done time for burglary and had been out for about a year."

Trevizo testified she "wanted to gather intelligence about the gang [Johnson] might be in" because "gather[ing] intelligence" was one of her "main missions in the task force." She hoped to learn about how big his possible gang was, where it was located, who its leaders were, and "what kind of crimes they're involved in." She sought to isolate him from the other occupants of the vehicle in the hope he would contribute more information. Her "intentions were only to gather gang intelligence and talk to him." The other passenger remained in the vehicle throughout the encounter, talking to the third police officer. According to Trevizo, Johnson "could have refused [to get out of the car], certainly."

Once Johnson left the vehicle in a normal manner, Trevizo "asked him to turn around," and she "patted him down for officer safety because [she] had a lot of information that would lead [her] to believe he might have a weapon on him." Trevizo did not tell Johnson she planned to pat him down before he got out of the vehicle but "made the decision" when he exited the vehicle. It was "the totality of what happened that evening that led [her] to pat him down." She had "not observe[d] anything that appeared to be criminal" at the time of the pat-down search. She stated he could have refused to turn around and put up his hands for the pat-down search. Trevizo felt the butt of a gun near Johnson's waist when she patted him down. Johnson then began to struggle, and she put handcuffs on him.

5

Johnson was charged with possession of a weapon by a prohibited possessor, possession of marijuana, and resisting arrest. The trial court denied his motion to suppress the evidence found in Trevizo's pat-down search. A jury found Johnson guilty of the first two charges but not guilty of resisting arrest.

*Johnson I*, 217 Ariz. 58, ¶¶ 2-10, 170 P.3d at 668-70.

¶5        After finding Johnson had two prior felony convictions, the trial court sentenced him to a mitigated, eight-year prison term for prohibited possession of a deadly weapon and to a concurrent, presumptive, one-year prison term for marijuana possession. Johnson appealed and, as we noted above, we reversed the court's denial of Johnson's motion to suppress. *Id.* ¶ 30. Because we found the encounter had been consensual, however, we expressly declined to reach the question whether Trevizo had a reasonable suspicion Johnson was armed and dangerous. *Id.* ¶ 27. Nor did we reach the other issues raised in Johnson's appeal. *Id.* ¶ 30. Pursuant to the Supreme Court's mandate, we now address these questions.

**Discussion**

Armed and Dangerous

¶6        "We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion if it involves a discretionary issue, but review constitutional issues and purely legal issues de novo." *State v. Moody*, 208 Ariz. 424, ¶ 62, 94 P.3d 1119, 1140 (2004) (citation omitted). As stated above, a police officer may frisk a passenger of a lawfully stopped vehicle for weapons if the officer has reason to believe the person is armed and

6

dangerous. *Johnson II*, 129 S. Ct. at 787. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* We do not view the relevant facts in isolation, but instead must determine whether the officer's conclusions were reasonable after "evaluat[ing] the totality of the circumstances." *State v. O'Meara*, 198 Ariz. 294, ¶ 9, 9 P.3d 325, 327 (2000).

¶7 The stop occurred in an area associated with the Crips gang—a gang whose members frequently wear blue clothing, as Johnson was. Johnson also informed Trevizo he was from Eloy, where she knew a Crips gang was active. Viewing these factors together, it was reasonable for Trevizo to suspect Johnson was a gang member.[1] And, according to Trevizo, gang members often carry firearms. Johnson, however, asserts that testimony did not support the conclusion he was armed and dangerous because Trevizo "said nothing about" whether Crips members in particular, as opposed to gang members in general, carried firearms. Johnson relies on our comment in *State v. Fornof*, 218 Ariz. 74, n.5, 179 P.3d 954,

---

[1]Even if, as Johnson suggests, the fact the vehicle's driver was wearing red clothing undermines the reasonableness of that conclusion, Trevizo testified she had not noticed what the driver was wearing.

7

959 n.5 (App. 2008), that we had "assign[ed] less weight than the trial court" to the officer's "law enforcement experience as a factor supporting reasonable suspicion" because "the state failed to introduce any evidence or elicit specific testimony relating [the officer's] considerable years of experience to the suspicious conduct he observed." But Trevizo's testimony sufficiently related her experience to the facts she observed; the import of her testimony was clearly that, in her experience, Crips members often carried firearms.

¶8 There were several other relevant factors present here.[2] Johnson informed Trevizo that he had been in prison for burglary. Additionally, he was carrying a police scanner, which Trevizo testified criminals use to avoid law enforcement officers.[3] Plainly, Trevizo's conclusion that Johnson might have been armed and dangerous was not based on "inchoate and unparticularized suspicion" but instead on "specific reasonable inferences" from the facts she observed. *Terry*, 392 U.S. at 27.

¶9 Although Johnson cites authority suggesting that, standing alone, the individual factors listed above might not warrant a pat-down search, he cites none where all, or even

---

[2]We agree with Johnson that the fact he looked back at the officers when they were stopping the car may be of questionable value in determining whether he was armed and dangerous. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000); *Gonzales-Rivera v. Immigration & Naturalization Serv.*, 22 F.3d 1441, 1446-47 (9th Cir. 1994); *but see United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008) (listing as fact supporting reasonable suspicion that defendant had "glance[d] towards" officer before placing hand in small of back and backing away).

[3]Although Trevizo was uncertain if the scanner was on or off, even assuming that were significantly relevant to assessing whether Johnson was armed and dangerous, Johnson easily could have turned the scanner off as the officers approached.

8

most, of these factors are present.[4]  For example, Johnson relies heavily on *United States v. Davis*, 94 F.3d 1465, 1467 (10th Cir. 1996), in which the Tenth Circuit Court of Appeals concluded a *Terry* stop was unjustified when the defendant, a known criminal, walked away from officers who had asked him to stop, kept his hands in his pockets, and approached an establishment known for criminal activity.  But there was no evidence the defendant in *Davis* was part of an organization whose members are often armed, nor that he was carrying anything, like the police scanner in this case, that might arouse suspicion when viewed in light of all the surrounding circumstances.  94 F.3d at 1468-70.  Moreover, the officer in *Davis* testified that he had no information suggesting the defendant had a firearm and that his conclusion the defendant was armed and engaging in criminal activity was based on what he "fe[lt]."  *Id.* at 1469; *see Terry*, 392 U.S. at 27 (reasonableness must rest on more than unparticularized suspicion).   And, even if we agreed that Johnson's cooperation and his admission of a burglary conviction when queried weigh against an inference that he was armed and dangerous, those facts would not render Trevizo's suspicion unreasonable in light of all the circumstances present here.[5]  *See O'Meara*, 198 Ariz. 294, ¶ 9, 9 P.3d at 327.

---

[4]In his opening brief, Johnson cites extensively to *United States v. Mendez*, 467 F.3d 1162 (9th Cir. 2006), but that opinion was subsequently withdrawn by the Ninth Circuit.  *See* 476 F.3d 1077, 1078 (9th Cir. 2007).  Accordingly, we do not consider it.  *Cf.* Ariz. R. Civ. App. P. 28(c).

[5]We note that, despite Johnson's characterization of burglary as a "nonviolent crime" that therefore did not support an inference Johnson may have been armed and dangerous, the elements of burglary can include the possession of "explosives, a deadly weapon or dangerous instrument."  A.R.S. § 13-1508(A).

9

**¶10** Finally, the state has provided authority in which pat-down searches were found constitutionally valid based on similar facts. *See, e.g., United States v. Flett*, 806 F.2d 823, 828 (8th Cir. 1986) (search proper when appellant dressed like members of gang known for "violent propensities"); *State v. Anderson*, 119 P.3d 1171, 1180 (Kan. Ct. App. 2005) (pat-down search justified when officers suspected drug activity and knew passenger "was a gang member and might be carrying a gun"); *State v. Jackson*, 78 P.3d 584, 587 (Or. Ct. App. 2003) (pat-down of passenger justified when, inter alia, vehicle "spe[d] off when officers approached," stop occurred in gang territory, and driver had known gang affiliation). Here, Trevizo had encountered an admitted felon carrying a police scanner, who was dressed in clothing consistent with membership in a particular gang, in an area where that gang was active. These facts, combined with her knowledge that gang members often carry firearms and that police scanners are used by criminals to evade police, justified Trevizo's conclusion that Johnson might have been armed and dangerous. Thus, her pat-down search of Johnson was proper under the Fourth Amendment. *See Johnson II*, 129 S. Ct. at 787. As our supreme court has stated about street encounters, "'[e]ven when the police officer has the upper hand, the tables are easily turned'"; thus, "officers should have leeway in handling such situations and should not be compelled to act at their peril." *State v. Vasquez*, 167 Ariz. 352, 354, 807 P.2d 520, 522 (1991), *quoting People v. Peters*, 219 N.E.2d 595, 599 (N.Y. 1966) (alteration in *Vasquez*).

Right to Privacy under the Arizona Constitution

¶11        Johnson also argues that article II, § 8 of the Arizona Constitution provides a "broader right to privacy" than the Fourth Amendment.  Thus, he reasons, we need not reach the same conclusions as the United States Supreme Court did in *Johnson II* that passengers may be subject to search without a suspicion of criminal activity or that Trevizo's questioning Johnson about matters unrelated to the stop was permissible because it did not measurably extend the stop's duration.[6]  *See Johnson II*, 129 S. Ct. at 783, 788; *see also Muehler v. Mena*, 544 U.S. 93, 100-01 (2005).

¶12        Article II, § 8 states:  "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."  The Fourth Amendment provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."   Our supreme court has stated that, although "Arizona's constitutional provisions generally were intended to incorporate the federal protections, they are specific in preserving the sanctity of homes and in creating a right of privacy."  *State v. Bolt*, 142 Ariz. 260, 264-65, 689 P.2d 519, 523-24 (1984) (citation omitted); *see also State v. Pelosi*, 68 Ariz. 51, 57, 199 P.2d 125, 129 (1948)

---

[6]Johnson asserts "[t]he State . . . failed to establish that the traffic stop was still ongoing" and reasons that, had the driver's paperwork been returned, "there was no conceivable basis for continuing Johnson's seizure." But, as Johnson acknowledges, another officer was speaking with the driver while Trevizo spoke with Johnson.  In the absence of any evidence suggesting otherwise, that fact clearly permits the inference the traffic stop had not yet ended.

(article II, § 8 "was adopted for the purpose of preserving the rights which the Fourth Amendment to the Federal Constitution was intended to protect"), *overruled on other grounds by State v. Pina*, 94 Ariz. 243, 245, 388 P.2d 167, 168 (1963), and *Adams v. Bolin*, 74 Ariz. 269, 247 P.2d 617 (1952). In *Bolt*, the court declined to follow the United States Supreme Court's holding in *Segura v. United States*, 468 U.S. 796 (1984), which had approved a warrantless entry of a home in the absence of exigent circumstances. The Arizona court held instead that, "in the absence of exigent circumstances or other necessity," police officers may without a warrant secure premises by preventing ingress or egress but may not enter a home until a search warrant can be obtained. *Bolt*, 142 Ariz. at 265, 689 P.2d at 524.

¶13        But we find no authority holding Arizona's right to privacy outside the context of home searches to be broader in scope than the corresponding right to privacy in the United States Constitution.[7] *See generally State v. Juarez*, 203 Ariz. 441, ¶¶ 14-16, 55 P.3d 784, 787-88 (App. 2002) (citing cases). And, in addressing an automobile search, our supreme court long ago stated that article II, § 8, "although different in its language, is of the same

_____

[7]In his reply brief, citing *Rasmussen v. Fleming*, 154 Ariz. 207, 741 P.2d 674 (1987), Johnson asserts Arizona's "right to privacy has also been held to bestow greater rights than the federal constitution in the area of medical treatment." Although the Arizona supreme court observed in *Rasmussen* that, "[u]nlike the federal constitution, the Arizona Constitution expressly provides for a right to privacy," *id.* at 215, 741 P.2d at 682, the court did not suggest that right was broader than the federal right that "emanates from the penumbra of specific guarantees of particular amendments to the Constitution." *Id.* at 214, 741 P.2d at 681.

12

general effect and purpose as the Fourth Amendment, and, for that reason, decisions on the right of search under the latter are well in point." *Malmin v. State*, 30 Ariz. 258, 261, 246 P. 548, 548-49 (1926); *see also State v. Reyna*, 205 Ariz. 374, ¶ 14 & n.5, 71 P.3d 366, 369-70 & n.5 (App. 2003) ("[W]e do not read the court's decisions concerning home searches as evidencing a state-law departure from Fourth Amendment principles governing vehicle searches."). Similarly, Division One of this court has declined to find that Arizona's constitution provides greater protection than the Fourth Amendment for lawfully stopped drivers. *See State v. Teagle*, 217 Ariz. 17, n.3, 170 P.3d 266, 271 n.3 (App. 2007). Although Johnson identifies other states that have found greater protection in their state constitutions for lawfully stopped passengers, our jurisprudence has consistently found our constitutional protections to parallel those provided by the Fourth Amendment. *See Reyna*, 205 Ariz. 374, ¶ 14, 71 P.3d at 369 ("Our supreme court long ago held that Article 2, Section 8 of the Arizona Constitution 'is of the same general effect and purpose as the Fourth Amendment' and that the decisions concerning the scope of allowable vehicle searches under the federal constitution are 'well on point' in deciding cases under the Arizona Constitution."), *quoting Malmin*, 30 Ariz. at 261, 246 P. at 549.

¶14        The Supreme Court primarily grounded its *Johnson II* decision in officer-safety concerns—officers must be able to protect themselves at a traffic stop from both the driver and passengers. *See* 129 S. Ct. at 786-87. Additionally, officers must be able to control the scene of a traffic stop to protect the driver, passengers, and the public in general. Johnson

13

offers no reason to conclude passengers are less likely to be dangerous than drivers during a traffic stop. Nor does he explain why passengers should receive greater privacy protections than drivers. Although we recognize it is the driver, and not the passenger, who will have committed a violation warranting the stop, only rarely is that violation related to any criminal activity. "[T]he risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.'" *Johnson II*, 129 S. Ct. at 787, *quoting Maryland v. Wilson*, 519 U.S. 408, 414 (1997). Thus, the risk of violence by a driver is comparable to the risk presented by a passenger. *See Johnson II*, 129 S. Ct. at 787. Given these concerns, we conclude that the safety considerations justifying a temporary seizure of automobile passengers pursuant to a lawful traffic stop outweigh the privacy implications Johnson suggests.

¶15 Due to Arizona's long history of finding in our constitution no greater right to privacy in traffic stop cases than that found in the United States Constitution, we see no Arizona Constitution-based reason to depart from the rules announced in *Johnson II*. Thus, for the reasons stated, we conclude Trevizo's questioning and subsequent pat-down search of Johnson did not violate article II, § 8 of the Arizona Constitution.

Reasonable Doubt Jury Instruction

¶16 Johnson argues the reasonable doubt instruction the trial court gave pursuant to *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), was structural error because it

14

improperly lowered the required standard of proof. Our supreme court repeatedly has rejected similar challenges to the instruction the *Portillo* court directed trial courts to give. *See, e.g., State v. Garza*, 216 Ariz. 56, ¶ 45, 163 P.3d 1006, 1016-17 (2007); *State v. Ellison*, 213 Ariz. 116, ¶ 63, 140 P.3d 899, 916 (2006); *State v. Roseberry*, 210 Ariz. 360, ¶ 55, 111 P.3d 402, 411-12 (2005); *State v. Dann*, 205 Ariz. 557, ¶ 74, 74 P.3d 231, 249-50 (2003); *State v. Lamar*, 205 Ariz. 431, ¶ 49, 72 P.3d 831, 841 (2003); *State v. Cañez*, 202 Ariz. 133, ¶ 76, 42 P.3d 564, 587 (2002); *State v. Van Adams*, 194 Ariz. 408, ¶¶ 29-30, 984 P.2d 16, 25-26 (1999). We are bound to follow our supreme court's decisions. *See State v. Sullivan*, 205 Ariz. 285, ¶ 15, 69 P.3d 1006, 1009 (App. 2003). Johnson acknowledges our supreme court has rejected similar arguments and notes he merely "present[ed] this issue in order to preserve it." Thus, we need not address this argument further.

Right to Jury Trial for Prior Convictions

**¶17** Last, Johnson asserts the trial court's finding of his two prior felony convictions violated his right to a jury trial. We have repeatedly held, however, that a defendant's right to a jury trial is not violated when the trial court, rather than a jury, determines whether the defendant has prior felony convictions for purposes of sentence enhancement. *See State v. Robles*, 213 Ariz. 268, ¶ 19, 141 P.3d 748, 754 (App. 2006); *State v. Keith*, 211 Ariz. 436, ¶¶ 2-3, 122 P.3d 229, 229-30 (App. 2005); *Newkirk v. Nothwehr*, 210 Ariz. 601, ¶¶ 5-14, 115 P.3d 1264, 1266-67 (App. 2005).

15

## Disposition

¶18       We affirm Johnson's convictions and sentences.

_____
J. WILLIAM BRAMMER, JR., Judge

CONCURRING:

_____
PETER J. ECKERSTROM, Presiding Judge

_____
PHILIP G. ESPINOSA, Judge