63 P.3d 309

**Craig W. PETERSEN, Plaintiff–Appellee,**

v.

**CITY OF MESA, Defendant–Appellant.**

No. 1 CA–CV 02–0016.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 25, 2003.

Skousen, Skousen, Gulbrandson & Patience, P.C. By David L. Abney, Mesa, Attorney for Plaintiff–Appellee.

City of Mesa Attorney's Office By Rosemary H. Rosales, Catherine M. Bowman, Mesa, Attorneys for Defendant–Appellant.

**OPINION**

VOSS, Judge.

¶ 1 Craig W. Petersen, a firefighter for the City of Mesa, challenged the constitutionality of the random testing component of the City's proposed Substance Abuse Program Alcohol and Controlled Substance Testing Policy and Procedures (Policy). In awarding summary judgment to Petersen and permanently enjoining the City from implementing the random, suspicionless aspect of the Policy, the trial court relied on Article 2, Section 8 of the Arizona Constitution. In this context, however, we conclude that the strictures imposed by our constitution are no greater than those of the Fourth Amendment of the United States Constitution and that random testing is not an unreasonable search in violation of either constitution. We therefore reverse the summary judgment in favor of Petersen and vacate the injunction.

## BACKGROUND

¶ 2 In response to Petersen's complaint for declaratory and injunctive relief, the City filed a motion to dismiss. When both parties submitted additional supporting information, the trial court treated the motion as one for summary judgment. After a hearing, the trial court found that no material facts were in dispute but that the random, suspicionless drug and alcohol testing component [1] violated Article 2, Section 8 of the Arizona Constitution. That provision states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

¶ 3 The trial court cited State v. Ault, 150 Ariz. 459, 463, 466, 724 P.2d 545, 549, 552 (1986) (Article 2, Section 8 bars admission of evidence seized during illegal search of home), and State v. Tykwinski, 170 Ariz. 365, 371, 824 P.2d 761, 767 (App.1991) (rejecting assertion that Article 2, Section 8, although more extensive than Fourth Amendment, requires individualized suspicion to conduct roadblock stop), in support of its conclusion that Arizona's Constitution "is broader and more explicit than the Fourth Amendment in safeguarding the fundamental liberty of Arizona citizens." [2] The court also relied on an Alaska Supreme Court decision that interpreted the Alaska Constitution to bar ongoing random drug testing as overly intrusive of employee privacy because the testing was not based on "predictable, job-related occurrences" and was not implemented in response to demonstrated drug abuse in the workplace.[3] See Anchorage Police Dep't Employees Ass'n v. Municipality of Anchorage, 24 P.3d 547, 558–59 (Alaska 2001). The trial court concluded that the City failed to demonstrate a compelling interest to justify the intrusion on Petersen's reasonable expectation of privacy and therefore enjoined random, suspicionless testing.

## DISCUSSION

■ ¶ 4 In reviewing a trial court's ruling on the reasonableness of a government search, we defer to that court's factual findings, but we determine de novo whether the search was unreasonable and thus violated the Constitution. State v. Adams, 197 Ariz. 569, 572, ¶ 16, 5 P.3d 903, 906 (App.2000).

### A. The City's Policy

¶ 5 The stated purpose of the City's Policy is to provide firefighters "with a safe, productive working environment"; to ensure "the safety and well-being of the general public"; to ensure that firefighters "receive educational [sic] and training on substance abuse"; and to ensure that they "are well informed on the hazards of substance abuse and are provided employee assistance as needed."

¶ 6 Firefighters must submit [4] to testing of breath or urine [5] "on an unannounced and random basis spread reasonably throughout the calendar year." A computer software program selects the employees to be tested. Those selected are not given any advance notice and can be notified immediately before, during, or immediately following work. All tests are to be conducted within thirty minutes of selection, with allowance for travel time to the collection location. When urine is to be collected, the employee may use a private bathroom stall. A monitor inspects the sample for proper color and

1. The Policy allows for random breath and urine testing. Because the complaint, briefs, and trial court's order do not distinguish between the two types of testing for purposes of constitutional analysis, our decision similarly does not distinguish between the two types.

2. The Fourth Amendment of the United States Constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

3. The dissent also relies on this case although the Alaska Supreme Court expressly eschewed reference to the Fourth Amendment. Anchorage Police Dep't, 24 P.3d at 550 ("[W]e base our ultimate ruling exclusively on the Alaska Constitution.").

4. Firefighters must also submit to post-accident as well as reasonable suspicion testing and, in certain circumstances, return-to-duty and follow-up testing. Petersen does not challenge these portions of the Policy.

5. Test samples are screened only for the presence of marijuana and cocaine metabolites, morphine, phencyclidine, amphetamine, codeine, and methamphetamine.

temperature and then bottles and labels the sample for shipping.

¶ 7 A firefighter who refuses to submit to a test is terminated from employment. A firefighter whose breath test reveals an alcohol concentration of 0.04 or higher or whose urine sample is "positive" for any of several specified drugs is removed from duty and evaluated by a substance abuse professional. Any firefighter who tests positive a second time is terminated from employment. Information in a firefighter's drug testing records is not released outside the department unless the firefighter consents.

## B. Article 2, Section 8 of the Arizona Constitution

¶ 8 We first address whether the trial court correctly found that Article 2, Section 8 provides greater protection for privacy rights than the Fourth Amendment in the context of drug testing. In three criminal cases involving warrantless police entry of a home, our supreme court has interpreted the words of Article 2, Section 8, "[n]o person shall be disturbed in his private affairs or his home invaded, without authority of law," to provide an independent state law ground for safeguarding the home and the privacy interests therein against a government search.

¶ 9 In *Ault*, after noting that the Arizona Constitution "generally ... incorporate[s] federal protections," the court held that Article 2, Section 8 is "specific in preserving the sanctity of homes and in creating a right of privacy." 150 Ariz. at 466, 724 P.2d at 552. Thus, police could not enter a home without a warrant or any exigency, illegally arrest the occupant, and seize evidence in plain view. *Id.* at 464, 466, 724 P.2d at 550, 552. The court also observed that the inevitable discovery doctrine had been limited to searches of a car and of a hotel room. *Id.* at 465, 724 P.2d at 551.

¶ 10 Concern that the Fourth Amendment might not bar a warrantless entry for police to "secure" and inspect a home while awaiting a warrant led the court, in *State v. Bolt*, to clarify that "[s]uch entries are 'per se unlawful' under our state constitution." 142 Ariz. 260, 264–65, 689 P.2d 519, 523–24 (1984) (quoting *State v. Cook*, 115 Ariz. 188, 194, 564

P.2d 877, 883 (1977)). But, the court rejected as "poor judicial policy" adoption of inconsistent state and federal exclusionary rules and held that the state rule would mirror that of the federal courts. *Id.* at 269, 689 P.2d at 528.

¶ 11 Finally, in *State v. Martin*, police entered a home and conducted a "sweep" without a warrant. 139 Ariz. 466, 470, 679 P.2d 489, 493 (1984). The court cited the Fourth Amendment's chief purpose, to guard against intrusion of the home and the associated privacy rights of the occupant, *id.* at 473, 679 P.2d at 496, to hold that under either the federal or state Constitution, the entry was illegal. *Id.* at 474, 679 P.2d at 497.

¶ 12 Thus, despite suggestions that Article 2, Section 8 may exceed the scope of the Fourth Amendment, in general our courts have found Arizona's Constitutional protection of privacy to be consistent or coextensive with that of the Fourth Amendment. *See, e.g., Mazen v. Seidel,* 189 Ariz. 195, 199, 940 P.2d 923, 927 (1997) (holding warrantless entry of rented storage unit by police and their seizure of contraband after firefighters' valid initial entry is permitted by both Arizona Constitution and Fourth Amendment); *State v. Krantz,* 174 Ariz. 211, 215, 848 P.2d 296, 300 (App.1992) (finding Article 2, Section 8 does not exceed Fourth Amendment and does not forbid warrantless taking of blood to test its alcohol content); *State v. Allgood,* 171 Ariz. 522, 523–24, 831 P.2d 1290, 1291–92 (App.1992) (noting that more expansive reading of Arizona's Constitution is "generally not applied beyond the home" and that police interception of confrontation call violated neither federal nor state constitutions); *State v. Wedding,* 171 Ariz. 399, 407, 831 P.2d 398, 406 (App.1992) (distinguishing *Bolt, Ault,* and *Martin* as concerned with warrantless entry of a home); *State v. Calabrese,* 157 Ariz. 189, 190–91, 755 P.2d 1177, 1178–79 (App.1988) (declining to narrow, on Arizona constitutional grounds, right of police to seize evidence found during warrantless search incident to lawful arrest).

¶ 13 While our courts have vigorously guarded the sanctity of the home from warrantless intrusions by law enforcement offi-

cers, nothing in the cited cases or in the text of Article 2, Section 8 persuades us that the latter provides more protection than the Fourth Amendment when the government conducts a search of a firefighter's urine for the presence of illegal drugs. See *Bolt*, 142 Ariz. at 264, 689 P.2d at 523 (recognizing need for uniformity between federal and state courts and that our constitution generally incorporates federal protections); *State v. Pelosi*, 68 Ariz. 51, 57, 199 P.2d 125, 129 (1948), *overruled in part on other grounds*, *Adams v. Bolin*, 74 Ariz. 269, 275, 247 P.2d 617, 621 (1952) (Article 2, Section 8's purpose is to preserve Fourth Amendment rights); *Malmin v. State*, 30 Ariz. 258, 261, 246 P. 548, 549 (1926) (although its language may differ from Fourth Amendment, Article 2, Section 8 has "same general effect and purpose" and will be similarly interpreted).

¶ 14 Accordingly, we hold that in the context of the City's drug and alcohol testing program, the bounds of Article 2, Section 8 do not exceed those of the Fourth Amendment. We now turn to whether the random aspect of the testing is an unreasonable search prohibited by the Fourth Amendment and by the coextensive reach of the Arizona Constitution.

## C. Validity of Random, Suspicionless Drug Testing

¶ 15 At the outset, we note that although the United States Supreme Court has approved employee drug testing in some contexts, it has not yet addressed random drug testing of firefighters. Therefore, we begin with a brief overview of the Court's general analysis of drug testing programs. Government-compelled collection and testing of urine for evidence of illegal drug use is a search subject to the Fourth Amendment. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (allowing random drug testing of high school athletes); *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 617, 633, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding drug and alcohol testing of railroad employees after accidents or violations of safety rules). To determine whether a government search is reasonable, the Court has balanced the degree of the intrusion on individual privacy against the extent to which the intrusion promotes legitimate governmental interests. *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402. The precise contours of the Fourth Amendment protection, of course, turn on the facts and may vary depending on whether the search invades expectations of privacy in a home, a vehicle, the workplace, a public school, or a park. *See Vernonia*, 515 U.S. at 654, 115 S.Ct. 2386.

¶ 16 Generally, a government search for evidence of criminal conduct is reasonable if a neutral magistrate first determines that probable cause exists to believe described evidence may be found in the place to be searched. *See, e.g., Payton v. New York*, 445 U.S. 573, 586 n. 24, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Ault*, 150 Ariz. at 466–67, 724 P.2d at 552–53. But, neither a search warrant nor probable cause are necessary if " 'special needs,' " beyond law enforcement's normal concerns with crime detection, render the warrant or probable cause requirement "impracticable." *Vernonia*, 515 U.S. at 653, 115 S.Ct. 2386 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (approving warrantless search of a probationer's home)).

¶ 17 For example, in *Skinner*, the railroads had a special need, in order to prevent drug or alcohol-related accidents, to ban workers' use of alcohol or drugs and to test their blood or urine to assure the ban's effectiveness. 489 U.S. at 620–21, 109 S.Ct. 1402. Because the authorizing regulations identified the circumstances justifying the testing and the conditions under which it occurred, "there [were] virtually no facts for a neutral magistrate to evaluate." *Id.* at 622, 109 S.Ct. 1402. More importantly, when delay to seek a warrant would seriously impede the collection of critical evidence, the balance tipped in favor of finding a warrantless intrusion reasonable. *Id.* at 623–24, 109 S.Ct. 1402.

¶ 18 The testing in *Skinner* was not random, but it was also not based on individualized suspicion. *Id.* at 624, 109 S.Ct. 1402. The Court nevertheless concluded that by working in a highly regulated industry, the employees had diminished expectations of privacy, *id.* at 627, 109 S.Ct. 1402, and that

the interest in testing was "compelling," in part because of the difficulty in detecting in any other way employees who were impaired while at work. *Id.* at 628–29, 109 S.Ct. 1402.

¶ 19 The Supreme Court similarly found a special need to exist when the United States Customs Service adopted a drug testing program for employees who sought a transfer or promotion to positions that were directly involved in drug interdiction or law enforcement or that required the employee to carry a firearm or to handle classified material. *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 660–61, 666, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).[6] The program's aim was to deter drug use among those seeking promotion and to bar drug users from being promoted to such positions, thus serving governmental interests apart from those of law enforcement. *Id.* at 666, 109 S.Ct. 1384. As in *Skinner,* no special facts demanded a magistrate's evaluation: testing was automatic and anticipated by applicants for the specified positions, and requiring a warrant would deflect valuable resources from the agency's primary mission. *Id.* at 666–67, 109 S.Ct. 1402.

¶ 20 Additionally, the Court found that traditional ideas of probable cause "may be unhelpful in analyzing the reasonableness of routine administrative functions, especially where the Government seeks to prevent ... hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person." *Id.* at 668, 109 S.Ct. 1402 (citations omitted). The strong interest in ensuring the integrity, judgment, and fitness of employees who were directly involved in drug interdiction or were going to be armed, and in protecting the public from impaired employees, *id.* at 670–71, 109 S.Ct. 1402, outweighed the privacy interests of those subject to testing. *Id.* at 672, 109 S.Ct. 1402. "Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep

from the Service personal information that bears directly on their fitness." *Id.*

¶ 21 In the instant case, Petersen and our dissenting colleague strenuously contend that neither *Skinner* nor *Von Raab* approved *random* testing and that the City cannot institute a drug and alcohol testing program unless it is founded on individualized suspicion and a history of drug or alcohol abuse in the workplace. *Von Raab* clearly held, however, that when the Government's purpose is to discover or prevent from arising hidden conditions that create safety concerns, such as employees' impairment by drugs or alcohol while at work, its purpose may justify searches "*without any measure of individualized suspicion.*" *Id.* at 668, 109 S.Ct. 1384 (emphasis added). The "compelling interest" in avoiding the public harm from impaired employees, *id.* at 670–71, 109 S.Ct. 1384, particularly in light of the "special, and obvious, physical and ethical demands" on those employees, *id.* at 679, 109 S.Ct. 1384, outweighed the intrusion on the employees' privacy, even if no drug abuse problem had prompted the testing program. *Id.* at 660, 109 S.Ct. 1384.

¶ 22 More recently, and again in the absence of a serious drug problem, the Supreme Court upheld drug testing of middle and high school students who participated in extracurricular activities. *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls,* 536 U.S. 822, ——, 122 S.Ct. 2559, 2562–63, 153 L.Ed.2d 735 (2002). The school district's testing policy allowed both random testing and testing based on reasonable suspicion "at any time." *Id.* at ——, 122 S.Ct. at 2563.

¶ 23 The students challenging the policy argued that testing should at least require a minimal level of individualized suspicion, but the Court cited *Von Raab* and *Skinner* to reach a contrary conclusion. *Id.* at ——, 122 S.Ct. at 2564. As in both of those cases, the Court cited the compelling need to detect "'latent or hidden conditions, or to prevent their development,'" so that searches could take place without any indicia of individual-

---

**6.** *Compare Chandler v. Miller,* 520 U.S. 305, 318–22, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), in which the Court held that no special need supported state-mandated, suspicionless drug testing of candidates for state offices. No drug problem existed among officials; public scrutiny could as effectively detect and deter illicit drug use; and most officials did not perform "high risk, safety sensitive tasks"; thus, the special need was largely symbolic rather than real.

ized suspicion or probable cause. *Id.* (quoting *Von Raab*, 489 U.S. at 668, 109 S.Ct. 1384).

¶ 24 In evaluating the degree of intrusion on privacy, the students' privacy interests were deemed diminished, as were the interests of workers in closely regulated industries, by the public school district's custodial role and by the students' compliance with additional rules governing participation in extracurricular activities. *Id.* at ——, 122 S.Ct. at 2565–66. Also, the character of the intrusion was termed negligible because students could produce a urine sample in a closed bathroom stall while a faculty monitor waited outside, and despite claims that test results were not carefully guarded, the school did not either give results to police or use results to impose discipline. *Id.* at ——, 122 S.Ct. at 2566–67. Similarly, in *Vernonia*, 515 U.S. at 658, 115 S.Ct. 2386, the Court found the privacy invasion minor because the students giving urine samples, who remained fully clothed and not subject to direct observation by the monitor, encountered conditions much like those in public restrooms. The samples were tested only for specified drugs and did not reveal any other information; test results were disclosed to a limited group of persons and were not given to police.

¶ 25 On the other side of the scale, the Court accepted as well-known the health and safety risks of drug use and added that "it would make little sense" to require that a problem be allowed to develop before the school district could seek to prevent it. *Id.* at ——, 122 S.Ct. at 2568. *See also Von Raab*, 489 U.S. at 675 n. 3, 109 S.Ct. 1384 (when government aims to deter "highly hazardous conduct, a low incidence of such conduct, far from impugning the validity of the [testing] scheme . . ., is more logically viewed as a hallmark of success"). The Court also noted that some teachers had reported seeing students who appeared to be under the influence of drugs at school. *Id.* at ——, 122 S.Ct. at 2567. It concluded that in light of a "nationwide epidemic of drug use," *neither "a particularized or pervasive drug problem," id.* at ——, 122 S.Ct. at 2568 (emphasis added), *nor individualized suspicion was necessary to support random drug testing.*

¶ 26 In fact, the Court warned that requiring individualized suspicion might have unintended consequences such as targeting unpopular groups or causing the district, out of fear of litigation over whether the suspicion was justified in a particular case, to less vigorously enforce the testing and so lose its benefits. *Id.* —— at ——, 122 S.Ct. at 2568–69. The Court further held that, "[i]n any case, this Court has repeatedly stated that *reasonableness under the Fourth Amendment does not require employing the least intrusive means." Id.* at ——, 122 S.Ct. at 2569 (emphasis added). The testing was "a reasonably effective means of addressing the School District's legitimate concerns in preventing, deterring, and detecting drug use." *Id.*

¶ 27 The four dissenting justices in *Earls* objected not to the lack of individualized suspicion so much as to the perversity of testing arguably those "least likely to be at risk from illicit drugs." *Id.* at ——, 122 S.Ct. at 2572 (Ginsburg, J., dissenting). The dissent also contended that the balance of the school district's interests against the students' privacy interests was improperly struck when the nature of student participation in choir, band, or academic team, as contrasted with participation in athletics, did not necessarily reduce the students' privacy expectations, and no documented drug problem bolstered the need for testing. *Id.* at ——, 122 S.Ct. at 2574–75. Justice Ginsburg distinguished *Skinner* and *Von Raab* because testing in those cases sought to avoid enormous health and safety risks to others; she distinguished *Vernonia* because physical exertion by drug-using athletes created serious risk of injury to the athletes and to other players. *Id.* at ——, 122 S.Ct. at 2575–76.

¶ 28 Here, as in *Skinner* and *Von Raab*, the testing is imposed on individuals who have substantially reduced expectations of privacy because they work in a highly regulated occupation, and if impaired, place themselves, co-workers, and the public at grave risk. Thus, we disagree with the dissent's suggestion that firefighters' rights to privacy are only slightly diminished compared to those of other adults. Moreover, we see little ground to distinguish approval

of a school district's random drug testing to detect and deter illegal drug use by student athletes (*Vernonia*) or by students engaged in after school activities (*Earls*) from the City's random drug testing of firefighters to detect and deter illegal drug use.

¶ 29 The dissent characterizes the City's interest in testing its firefighters as merely "symbolic" and suggests without elaboration that the risks to public safety that the City seeks to avoid through its testing program are not "substantial and real." The dissent notes that employees in a number of other positions identified as "safety sensitive" are subject to testing. However, testing of firefighters is the sole issue here, and our colleague seriously underestimates the rigorous nature of firefighters' duties and the potential harm that impaired firefighters might inflict. Thus, we do not doubt that the City's interest in ensuring that its firefighters are in optimum condition is compelling. Firefighters must be mentally alert at all times in order to instantly respond to a crisis and grasp and follow orders, particularly when a split-second decision or error in judgment may prove fatal; they also must be physically fit in order to perform under the extremely demanding and dangerous conditions that jeopardize their own lives, the lives of their co-workers, and the lives and property of the public. Furthermore, even off-duty drug or alcohol consumption may imperil safety interests if firefighters can be recalled to duty in an emergency. Given the daunting responsibilities they must shoulder on a moment's notice, firefighters expect, and necessarily accede to, more governmental regulation than most workers. Because the trust placed in them is so great, the need to detect a firefighter who is impaired at work is equally great.

¶ 30 Additionally, although the firefighters' communal working environment reduces their expectations of privacy and engenders camaraderie and a certain esprit de corps, that camaraderie may make testing dependent on individualized suspicion less effective or less likely to occur. As Justice Breyer reiterated in his concurring opinion in *Earls*, testing based on individualized suspicion, while seemingly more reasonable, might instead result in use of "subjective criteria" to identify who will be tested or in stigmatizing those actually selected. 536 U.S. at ——, 122 S.Ct. at 2571 (Breyer, J., concurring). In *Vernonia*, the Court noted that the athletes' parents found random testing less objectionable than suspicion-based testing because the latter "transform[ed] the process into a badge of shame." 515 U.S. at 663, 115 S.Ct. 2386.

¶ 31 Other courts faced with constitutional challenges to drug testing programs have upheld random and/or suspicionless testing of firefighters and those who occupy safety-sensitive positions. In *Doe v. City and County of Honolulu*, 8 Haw.App. 571, 816 P.2d 306, 310–11 (1991), for example, a firefighter challenged a suspicionless drug testing program. After citing *Harmon v. Thornburgh*, 878 F.2d 484, 489 (D.C.Cir. 1989),[7] the court stated that random testing should not be analyzed differently than the pre-transfer or pre-promotion testing in *Von Raab* or the post-accident testing in *Skinner*. *Id.* at 314. The court considered the public safety as well as the firefighters' "health, safety and job performance" to find that testing served a special need. *Id.* It also found the firefighters' privacy expectations diminished by the giving of blood and urine during annual physicals, by regulation of their off-duty conduct, and by their need for strength, stamina, judgment, and alertness on the job. *Id.* at 314–15. The court finally rejected a claim that less intrusive means could detect drug use or impairment, citing *Skinner*, 489 U.S. at 629 n. 9, 109 S.Ct. 1402 (possibility of a less intrusive means of conducting a search is not the touchstone) and concluded that a compelling interest in safety outweighed the minimal intrusion on privacy. *Id.* at 316.

¶ 32 Many federal and state courts have similarly found employee drug testing programs constitutional. *See Hatley v. Dep't of the Navy*, 164 F.3d 602, 603–04 (Fed.Cir. 1998) (random drug testing of firefighter working on military base); *Aubrey v. Sch.*

---

**7.** In *Harmon,* the court found no constitutional violation in random testing of government employees holding top secret national security clearances. 878 F.2d at 496.

*Bd. of Lafayette Parish,* 148 F.3d 559, 563–65 (5th Cir.1998)(suspicionless and random testing of school custodians when no general drug problem existed); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.,* 158 F.3d 361, 384 (6th Cir.1998) (suspicionless but not random drug testing of teaching applicants without any documented workplace drug problem); *Wilcher v. City of Wilmington,* 139 F.3d 366, 373–78 (3rd Cir.1998) (random drug testing of firefighters that required direct supervision of urine collection); *Saavedra v. Albuquerque,* 73 F.3d 1525, 1532 (10th Cir.1996) (reasonable suspicion-based testing of City's firefighters); *Bluestein v. Skinner,* 908 F.2d 451, 456–57 (9th Cir.1990) (random nature of testing of airline personnel is relevant to reasonableness of program but also may be more effective deterrent and does not render testing unreasonable); *Nat'l Fed'n of Fed. Employees v. Cheney,* 884 F.2d 603, 610–13 (D.C.Cir.1989) (suspicionless random testing of civilians employed by military in aviation and police functions); *Policemen's Benev. Ass'n of New Jersey v. Washington Township,* 850 F.2d 133, 141 (3rd Cir.1988) (suspicionless random drug testing of police officers); *Rushton v. Nebraska Pub. Power Dist.,* 844 F.2d 562, 566–67 (8th Cir.1988) (suspicionless random testing of nuclear power plant engineers). *But see Anchorage Police Dep't,* 24 P.3d at 557–58 (relying on state constitution to approve post-accident or event-related testing of police officers but finding random testing creates " 'fear and surprise' " and that, without extant drug problem, privacy interests outweigh government's less immediate need); *Guiney v. Police Comm'r of Boston,* 411 Mass. 328, 582 N.E.2d 523, 525–26 (1991) (relying on state law to strike down random drug testing of police officers because no drug problem existed); *Beattie v. City of St. Petersburg Beach,* 733 F.Supp. 1455, 1458–59 (M.D.Fla. 1990) (city's safety interest not sufficiently compelling to test all firefighters for drug use, without any individualized suspicion, during annual physicals when no drug problem had been documented).

¶ 33 If firefighters must be ever-vigilant, we think the City can be no less vigilant in detecting impaired firefighters and removing them from the workforce. Therefore, we conclude that the City's interests are sufficiently compelling to permit random testing.

## CONCLUSION

¶ 34 After balancing Petersen's reduced expectations of privacy against the City's compelling need to discover specific but hidden conditions representing grave risks to the health and safety of the firefighters and the public, we hold that the random testing component of the Policy is reasonable under both Article 2, Section 8 of the Arizona Constitution and the Fourth Amendment of the United States Constitution. We reverse the trial court's grant of summary judgment, vacate the injunction, and remand for entry of summary judgment for the City.

CONCURRING: JOHN C. GEMMILL, Judge.

HALL, Judge, concurring in part and dissenting in part.

¶ 35 I agree with my colleagues that the Arizona Constitution affords no greater protection against drug testing than does the Fourth Amendment. *State v. Juarez,* 203 Ariz. 441, 444, ¶ 14, 55 P.3d 784, 787 (App. 2002). Thus, I concur in section B of the majority opinion. I believe, however, that the City's public safety interest in requiring firefighters to submit to random, unannounced, and suspicionless drug testing does not outweigh Petersen's Fourth Amendment "right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Therefore, I respectfully dissent from the majority's holding that the City-compelled collection and testing of urine and breath is constitutionally reasonable.

¶ 36 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment safeguards the privacy, dignity, and security of persons against certain arbitrary and invasive acts by state officers, *Skinner,* 489 U.S. at 613–14, 109 S.Ct. 1402, even when the government is acting in its

capacity as an employer, *O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion). *See also Camara v. Mun. Court of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ("The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.").

¶ 37 Because state-compelled collection and testing of urine "intrudes upon expectations of privacy that society has long recognized as reasonable," *Skinner,* 489 U.S. at 617–18, 109 S.Ct. 1402, such intrusions are "searches" under the Fourth Amendment:

There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.

*Id.* (quoting *Nat'l Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175 (5th Cir.1987), *aff'd in part, vacated in part,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)).[8] Not all governmental searches are proscribed by the Fourth Amendment, only those that are unreasonable. *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402. Reasonableness "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Id.* (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)).

¶ 38 The reasonableness of a particular search is determined, as my colleagues correctly state, by "balanc[ing] the degree of the intrusion on individual privacy against the extent to which the intrusion promotes legitimate governmental interests." *Ante* ¶ 15 (citing *Skinner,* 489 U.S. at 619, 109 S.Ct.

1402). Although the majority states the standard accurately, it then misapplies the standard by according too little significance to the degree to which random, unannounced, and suspicionless drug testing infringes on a person's bodily integrity and human dignity and by characterizing the Policy as meeting a "compelling" safety need in the complete absence of any facts demonstrating any actual problem that would justify dispensing with the "right of the people to be secure in their persons." U.S. Const. amend. IV.

¶ 39 *Skinner* does not support the imposition of a random, unannounced, and suspicionless drug-testing regimen for firefighters. First, as acknowledged by the majority, the testing at issue in *Skinner* was not random. Instead, a railroad employee, in the absence of any individualized suspicion, could only be tested if the employee was involved in a "triggering event" such as a train accident or incident, or a safety-rule violation. 489 U.S. at 609–11, 109 S.Ct. 1402. Second, the government's interest in combating the documented incidence of drug and alcohol use by railroad employees presented "special needs" that overrode the right of a citizen to be protected against arbitrary governmental intrusions on his or her privacy and justified dispensing with the warrant requirement or need for individualized suspicion. *Id.* at 620, 109 S.Ct. 1402. The Court believed that a warrant, which assures a citizen subject to its reach that any intrusion on privacy is "narrowly limited in its objective and scope," was unnecessary because "the circumstances justifying toxicological testing and the permissible limits of such intrusions [were] defined narrowly" in the policy. *Id.* at 622, 109 S.Ct. 1402. Further, "the delay necessary to procure a warrant [might] result in the destruction of valuable evidence" pertaining to an accident, incident, or rule violation. *Id.* at 622–23, 109 S.Ct. 1402.[9]

---

8. Likewise, subjecting a person to the compelled production of alveolar or "deep lung" breath "implicates [ ] concerns about bodily integrity" and is deemed a search. *Skinner,* 489 U.S. at 617, 109 S.Ct. 1402.

9. Justice *O'Connor,* who joined in the opinion, later described *Skinner* as being based "on the firm understanding that a requirement of indi-

vidualized suspicion for testing train operators for drug or alcohol impairment following serious train accidents would be unworkable because 'the scene of a serious rail accident is chaotic.'" *Vernonia,* 515 U.S. at 674–75, 115 S.Ct. 2386 (O'Connor, J., dissenting) (quoting *Skinner,* 489 U.S. at 631, 109 S.Ct. 1402).

¶ 40 In contrast, the City's Policy, which compels firefighters to submit to random testing without advance notice, requires no "justifying" triggering event. Although the City's goals of both discerning and deterring drug use are laudable, it can hardly be claimed that these ends justify the means of dispensing with the warrant requirement or the need for reasonable suspicion in the absence of any triggering event, the immediacy of which in *Skinner* made it constitutionally "reasonable" to conduct drug testing without a warrant or reasonable suspicion that the particular employee was impaired. *Id.* at 631, 109 S.Ct. 1402.

¶ 41 Likewise, *Von Raab* provides only limited support for the majority's conclusion that the Policy will not violate the Fourth Amendment's reasonableness requirement. As in *Skinner,* the drug tests performed on Customs employees in *Von Raab* were not random. Instead, only employees that had been accepted for promotion or transfer to one of three categories of covered positions were tested.[10] *Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. 1384. The Court identified several factors that it believed were sufficiently compelling to justify conducting suspicionless testing of employees who applied for promotion to positions directly involving the interdiction of illegal drugs or requiring the incumbent to carry a firearm:[11] (1) "[t]he Customs Service is our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population[,]" *i.e.,* the "smuggling of illicit narcotics[,]" (2) the exposure of Customs employees to drug traffickers and the controlled substances they seek to smuggle into the country create corresponding problems involving the safety and integrity of the employees, (3) the irreparable damage to the "national interest in self-protection" if drug users were not barred from positions involving the interdiction of illegal drugs, and (4) the public interest "demands effective measures to prevent the promotion of drug users to positions

that require the incumbent to carry a firearm[.]" *Id.* at 668–70, 109 S.Ct. 1384 (internal quotations omitted). In concluding that the government's compelling interest in waging the drug war and safeguarding our borders outweighed the privacy interests of the affected Customs employees, the Court emphasized that the requirement that employees be notified in advance of the scheduled sample collection reduced to a minimum any "unsettling show of authority" that may be associated with an unannounced intrusion on privacy, *id.* at 672 n. 2, 109 S.Ct. 1384 (quoting *Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)), and "contribute[d] significantly to diminish the program's intrusion on privacy[,]" *id.* at 676 n. 4, 109 S.Ct. 1384.

¶ 42 In comparison, the City's Policy, which requires *all* firefighters to submit to random and unannounced testing, is both broader and more intrusive than the drug-screening program upheld in *Von Raab.* The majority's interpretation of *Von Raab, ante* ¶ 21, as "justify[ing] searches '*without any measure of individualized suspicion* '" whenever the government's purpose is to discover or deter drug use by employees, effectively enables the City to bootstrap its desire to combat a nonexistent drug problem into a "compelling" justification that trumps the legitimate privacy rights of its employees. *Compare Beattie,* 733 F.Supp. at 1458 (holding that drug testing of firefighters unjustified "[w]ithout some form of individualized suspicion or some compelling reason beyond a hypothetical future problem"). As stated in *Skinner,* the requirement of individualized suspicion may be jettisoned only in limited circumstances:

> [W]here the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

---

**10.** The covered positions were those that met one or more of three criteria: (1) direct involvement in drug interdiction or enforcement of related laws, (2) carrying a firearm, and (3) handling classified material. *Von Raab,* 489 U.S. at 660–61, 678, 109 S.Ct. 1384.

**11.** The Court remanded the case to determine whether the third category was reasonably limited in scope. *Id.* at 678, 109 S.Ct. 1384.

489 U.S. at 624, 109 S.Ct. 1402. More recently, in *Chandler v. Miller*, 520 U.S. 305, 309, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the Court characterized the narrow exception from the usual individualized suspicion requirement as a "closely guarded category of constitutionally permissible suspicionless searches."

¶ 43 Unlike the majority, I do not believe the City's symbolic need to portray its employees as being drug-free is the type of "special need" that justifies dispensing with traditional Fourth Amendment safeguards. Even if the special-needs exception presents as low of a hurdle as the City apparently believes,[12] the blanket suspicionless searches at issue here are not reasonable means to protect society in the absence of any showing that public safety is actually in jeopardy. The majority's observation that firefighters, "if impaired, place themselves, co-workers, and the public at grave risk[,]" *ante* ¶ 28, while accurate, is equally true of anyone who operates a motor vehicle on a public roadway while under the influence of intoxicants.

¶ 44 The majority also relies on the United States Supreme Court decisions in *Vernonia* and *Earls*, both of which addressed the constitutionality of suspicionless drug testing of students in public schools. Neither of these cases substantially supports the constitutionality of the City's Policy. In *Vernonia*, the Supreme Court upheld a school district's suspicionless drug testing of student athletes. 515 U.S. at 665, 115 S.Ct. 2386. In *Earls*, the Court, relying on *Vernonia*, upheld a drug-testing policy that required all students who participated in any extracurricular activity to submit to drug testing. 536 U.S. at ——, 122 S.Ct. at 2562. In both cases, the Court repeatedly emphasized the unique nature of the public school environment, where the Fourth Amendment is interpreted more leniently with respect to searches. *Earls*, 536 U.S. at ——, 122 S.Ct. at 2565 ("Fourth Amendment rights ... are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children.") (quoting *Vernonia*, 515 U.S. at 656, 115 S.Ct.

2386); *id.* ("Central ... is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster.") (quoting *Vernonia*, 515 U.S. at 654, 115 S.Ct. 2386); *id.* ("[W]hen the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake.") (quoting *Vernonia*, 515 U.S. at 665, 115 S.Ct. 2386). Obviously, unlike a public school student, a firefighter's right to privacy, although limited in some respects, is not inherently "subject[ ] to greater controls than those appropriate for adults." *Id.*

¶ 45 Unlike my colleagues, I have little trouble distinguishing the mandatory drug testing of students involved in extracurricular activities from the drug testing of firefighters pursuant to the Policy. The school districts in both *Vernonia* and *Earls* adopted their testing regimes in the face of a documented drug problem within their districts and against the background of a nationwide drug epidemic afflicting our children that "makes the war against drugs a pressing concern in every school." *Earls*, 536 U.S. at ——, 122 S.Ct. at 2567. Further, even though a history of pervasive drug use is not a prerequisite for the institution of suspicionless drug testing, such evidence, which is lacking here, "shore[s] up" the need for a government drug-testing program. *Id.* at ——, 122 S.Ct. at 2567–68 (quoting *Chandler*, 520 U.S. at 319, 117 S.Ct. 1295).

¶ 46 The majority's reliance on *Earls'* is particularly problematic given that Justice Breyer, who joined in the 5–4 decision, wrote a separate concurrence emphasizing his reliance on the nondisciplinary nature of the testing program, which "preserves an option for a conscientious objector. He can refuse testing while paying a price (nonparticipation) that is serious, but less severe than expulsion from the school." *Id.* at ——, 122 S.Ct. at 2571. In contrast, pursuant to the City's Policy, a firefighter who refuses to provide a urine sample on demand is auto-

---

**12.** Among the positions identified by the City as safety-sensitive in the Policy are meter reader, paint striper, tire service worker, and customer service representative.

matically terminated.[13]

¶ 47 Instead, I find persuasive the analysis in *Anchorage Police Department*, which involved an almost identical testing program to the one at issue here. In that case, the Supreme Court of Alaska held that the portion of the municipality's substance abuse testing policy that required police and fire department employees to submit to random and unannounced testing violated the Alaska Constitution. 24 P.3d at 558. Applying the special-needs balancing test as articulated by the United States Supreme Court, the court first upheld the superior court's finding that the municipality's interest in ensuring public safety outweighed the privacy intrusion that occurs when the employees are subjected to suspicionless urine testing for job-related events, such as application for employment, promotion, demotion, transfer, or after a vehicular accident. *Id.* at 556–57. However, the court then concluded that the balance shifted in favor of individual privacy rights in the case of an indefinite requirement of random testing. *Id.* at 557.

¶ 48 In determining that the municipality failed to establish a special need for the random-testing component of its policy, the court cited three considerations. *Id.* First, the municipality's random testing, which the court described as "a continuous and unrelenting government scrutiny that exposes the employee to unannounced testing at virtually any time[,]" placed increased demands on employees' reasonable expectations of privacy. *Id.* at 557–58. Second, unannounced random testing is more intrusive and has a broader reach than testing triggered by predictable, job-related occurrences such as promotion or transfer. *Id.* at 558. Third, because random

testing has no nexus to any job-related occurrence, it reduces the immediacy of the government's need for suspicionless testing:

> [I]n the absence of a documented history of substance abuse, then, the Municipality can claim no immediate, job-contextual need to know the results of a randomly drawn urinalysis; it can only claim a more attenuated institutional interest in checking.

*Id.* These same privacy considerations are magnified in the context of the City's Policy, which requires that any "conscientious objector" be terminated from employment.

¶ 49 In summary, the majority's conclusion that the City's interests are sufficiently compelling to justify imposition of its random, unannounced, and suspicionless drug testing program is not supported by the relevant United States Supreme Court cases. Moreover, its application of the "special-needs" rationale to dispense with any requirement of particularized suspicion, even though there is no evidence in the record of any past or ongoing drug problem among the City's firefighters, goes too far in eroding the Fourth Amendment protections enjoyed by all citizens. *See Camara*, 387 U.S. at 530, 87 S.Ct. 1727 ("It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."). Instead, I conclude that the City's asserted special need to deter drug abuse, the incidence of which is hypothetical, does not outweigh Petersen's right to be let alone absent individualized suspicion. Therefore, I would uphold the trial court's grant of summary judgment and affirm its order en-

---

**13.** Other cases cited by the majority are distinguishable because they: (1) do not address random drug testing, *e.g.*, *Wilcher*, 139 F.3d at 374 (firefighters consented to random drug testing in bargaining agreement with city); *Saavedra*, 73 F.3d at 1532 (testing of firefighters based on reasonable suspicion); *Doe*, 816 P.2d at 310 (urine routinely collected from firefighters and tested as part of their annual physical); (2) fail to conduct a careful analysis of the competing private and public interests, *e.g.*, *Hatley*, 164 F.3d at 604 (summarily upholding random drug testing of firefighters); (3) interpret Supreme Court precedent in this area in a more limited manner than does the majority, *e.g.*, *Harmon*, 878 F.2d at

490 ("*Von Raab* [ ] suggests that the government may search its employees only when a clear, direct nexus exists between the nature of the employee's duty and the nature of the feared violation."); or (4) uphold suspicionless searches conducted in response to risks to public safety that are substantial and real, *e.g.*, *Cheney*, 884 F.2d at 610–12 (suspicionless random testing of civilians employed by military in aviation and police functions); *Rushton*, 844 F.2d at 567 (engineers at nuclear power plants); *see also United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) (search of passengers and baggage before boarding commercial airliners).

joining the City from implementing the random, suspicionless part of its Policy.