SUPREME COURT OF ARIZONA
En Banc

CRAIG W. PETERSEN,                ) Arizona Supreme Court
                                  ) No. CV-03-0100-PR
              Plaintiff-Appellee, )
                                  ) Court of Appeals
          v.                      ) Division One
                                  ) No. 1 CA-CV 02-0016
CITY OF MESA,                     )
                                  ) Maricopa County
                                  ) Superior Court
          Defendant-Appellant.   ) No. CV 2001-090218
                                  )
_____ ) **O P I N I O N**

Appeal from Superior Court in Maricopa County
No. CV 2001-090218
The Honorable Robert D. Myers
**AFFIRMED**

Opinion of Court of Appeals, Division One
204 Ariz. 278, 63 P.3d 309 (App. 2003)
**VACATED**

Skousen, Skousen, Gulbrandsen & Patience, P.C.          Mesa
    by   David L. Abney, Esq.
Attorneys for Craig W. Petersen

City of Mesa Attorney's Office                          Mesa
    by   Deborah J. Spinner, Mesa City Attorney
         Rosemary H. Rosales
         Catherine M. Bowman
Attorneys for City of Mesa

M c G R E G O R, Vice Chief Justice

¶1      This case requires us to determine the
constitutionality of a city's random, suspicionless drug
testing of its firefighters.  We exercise jurisdiction
pursuant to Article VI, Section 5.3 of the Arizona

Constitution, Arizona Revised Statutes (A.R.S.) section 12-120.24, and Rule 23 of the Arizona Rules of Civil Appellate Procedure.

**I.**

¶2     Craig Petersen works as a firefighter for the City of Mesa.  In 2001, after Peterson was hired, the City implemented a substance abuse program (the Program) for the Mesa Fire Department.  The Program requires testing of firefighters (1) if the Department has reasonable suspicion to believe an individual firefighter has abused drugs or alcohol; (2) after a firefighter is involved in an accident on the job; (3) following a firefighter's return to duty or as a follow-up to "a determination that a covered member is in need of assistance"; and (4) "on an unannounced and random basis spread reasonably throughout the calendar year."

¶3     Under the Program's random testing provision, a computer program selects the firefighters to be tested. The Department notifies firefighters of their selection for random testing immediately before, during, or after work; the firefighters are to be tested within thirty minutes of their notification, with allowance for travel time to the laboratory for collection.   Once at the laboratory, firefighters are permitted to use private bathroom stalls

when providing urine samples, which are then inspected by a monitor for the proper color and temperature.

¶4     The laboratory tests the sample for the presence of marijuana, cocaine, opiates, amphetamines, and phencyclidine.[1]   The laboratory initially tests the specimens by using an immunoassay test that meets the requirements of the Food and Drug Administration for commercial distribution.   The laboratory then confirms all positive test results using the gas chromatography/mass spectrometry technique and reports positive results to a Medical Review Officer (MRO), who has a "detailed knowledge of possible alternate medical explanations."   The MRO reviews the results before giving the information to the Department's administrative official.   Only confirmed tests are reported to the Department as positive for a specific drug.   Before verifying a positive result, however, the MRO must contact the firefighter on a confidential basis.

¶5     The Department does not release information in a firefighter's drug testing record outside the Department without the firefighter's consent.   A firefighter whose test reveals a blood alcohol concentration in excess of that allowed under the Program or who tests positive for

---

[1]     In addition, twenty percent of those tested are selected for an alcohol breath test.

any of several specified drugs is removed from all covered positions and is evaluated by a substance abuse professional. The Department may discipline or terminate the employment of a firefighter who tests positive a second time or who refuses to submit to a required test.

¶6     According to section 8 of the Program, the primary purpose of the random testing component "is to deter prohibited alcohol and controlled substance use and to detect prohibited use for the purpose of removing identified users from the safety-sensitive work force." This purpose advances the City's goal of establishing "a work environment that is totally free of the harmful effects of drugs and the misuse of alcohol."

¶7     Petersen filed a complaint in superior court seeking declaratory and injunctive relief, alleging that the random testing component of the Program violated his rights under both Article II, Section 8 of the Arizona Constitution and the Fourth Amendment to the United States Constitution.[2]   The trial court held that the Program violated the Arizona Constitution and permanently enjoined

---

[2]     Petersen does not challenge testing on the basis of reasonable suspicion, after an on-the-job accident, following a return to duty, or as a follow-up to "a determination that a covered member is in need of assistance." As a result, we express no opinion regarding the constitutionality of these Program provisions.

4

the Department from continuing random, suspicionless drug and alcohol testing of the City's firefighters. The court of appeals reversed, holding that the Program's random testing component is reasonable under both the Arizona and United States Constitutions. The court reasoned that the City's "compelling need to discover specific but hidden conditions representing grave risks to the health and safety of the firefighters and the public" outweighed Petersen's privacy interests. *Petersen v. City of Mesa*, 204 Ariz. 278, 286 ¶ 34, 63 P.3d 309, 317 (App. 2003). Judge Hall dissented from the majority's conclusion that the random testing component of the Program is reasonable under the Fourth Amendment. *Id.* at 290-91 ¶ 49, 63 P.3d at 321-22 (Hall, J., concurring in part and dissenting in part).

¶8 Under the analysis set forth below, we hold that the Program's random testing component is unreasonable and therefore violates the Fourth Amendment to the United States Constitution.[3]

---

[3] Petersen argues that Article II, Section 8 of the Arizona Constitution, which expressly provides that "[n]o person shall be disturbed in his private affairs . . . without authority of law," affords greater protection against drug testing than does the Fourth Amendment. Our conclusion that the random testing component violates the Fourth Amendment obviates the need to consider whether the protections granted by the Arizona Constitution extend

¶9      The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 613-14 (1989). In this case, the parties agree that the City's collection and testing of a firefighter's urine and breath constitutes a "search" under the Fourth Amendment. *See*, *e.g.*, *id.* at 617 ("Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long

---

beyond those afforded defendants by the federal constitution. Although the Arizona Constitution may impose stricter standards on searches and seizures than does the federal constitution, Arizona courts cannot provide less protection than does the Fourth Amendment. *See*, *e.g.*, *Cooper v. California*, 386 U.S. 58, 62 (1967) ("Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so."); *Arnold v. City of Cleveland*, 616 N.E.2d 163, 169 (Ohio 1993) ("In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall.").

recognized as reasonable . . . these intrusions must be deemed searches under the Fourth Amendment.").

¶10    As the language of the Fourth Amendment makes clear, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 652 (1995). To be reasonable, a search generally must be based upon some level of individualized suspicion of wrongdoing. *Skinner*, 489 U.S. at 624. The purpose of requiring individualized suspicion "is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Id.* at 621-22.

¶11    The Supreme Court, however, has recognized limited exceptions to this general rule "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.* at 619 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Id.* at 624.

7

¶12     The City concedes that its use of random, suspicionless testing is not based on any level of individualized suspicion.  The City argues, however, that such testing is reasonable under the Fourth Amendment because the search "serves special governmental needs, beyond the normal need for law enforcement."  *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989).  Because the Department does not disclose test results to law enforcement officers or to other third parties without the firefighter's consent, Petersen recognizes that the Program is unrelated to the normal need for law enforcement.  Petersen maintains, however, that the City cannot enforce the Program's random testing component because the City's alleged "special needs" offered in support of the program are insufficient to overcome the privacy intrusion occasioned by the search.  Based on the record in this case, we agree.

**A.**

¶13     Neither the Supreme Court nor this court has considered the reasonableness of random, suspicionless testing of city firefighters.  The Supreme Court, however, has examined the constitutionality of suspicionless drug testing requirements analogous to the procedures Petersen challenges.  *See Bd. of Educ. of Indep. Sch. Dist. No. 92*

*v. Earls*, 536 U.S. 822 (2002) (high school students participating in competitive extracurricular activities); *Chandler v. Miller*, 520 U.S. 305 (1997) (candidates for political office); *Vernonia,* 515 U.S. 646 (high school students participating in interscholastic athletics); *Skinner*, 489 U.S. 602 (railway employees); *Von Raab*, 489 U.S. 656 (customs service agents); *see also Ferguson v. City of Charleston,* 532 U.S. 67 (2001) (holding unconstitutional a state hospital's drug testing of pregnant patients that involved hospital personnel notifying the police of patients who tested positive for cocaine). As each of these decisions illustrates, when presented with an alleged "special need" in support of a particular Fourth Amendment intrusion, a court must weigh the individual's Fourth Amendment interests against the proffered governmental interests to determine whether the search in question "fit[s] within the closely guarded category of constitutionally permissible suspicionless searches." *Chandler*, 520 U.S. at 309.

¶14    Applying this "special needs" balancing test to the facts presented in this case, we begin by analyzing the City's proffered interests. Although the City need not present a "compelling" interest, the City's interest must be "important enough" to justify the government's intrusion

9

into the firefighters' legitimate expectations of privacy. *Vernonia*, 515 U.S. at 661.

¶15     The City asserts that it has a "special need" to test firefighters because they occupy safety-sensitive positions.  The City alleges that random testing furthers this interest by deterring "prohibited alcohol and controlled substance use" and detecting "prohibited use for the purpose of removing identified users from the safety-sensitive work force."  We agree that the City has an interest in deterring and detecting prohibited alcohol and drug use among the City's firefighters.

¶16     Fourth Amendment analysis, however, requires that we do more than recognize that the City has an interest in deterring drug use among employees in safety-sensitive positions.  In addition, we must look to the nature and immediacy of the City's concern. *Id*. at 660.  That is, has the City identified a real and substantial risk? *Chandler*, 520 U.S. at 323.  If so, will the City's proposed invasion of its firefighters' privacy interests further the City's interest in deterring and detecting drug use among its firefighters? *Skinner*, 489 U.S. at 624.  Answering that question requires that we consider the efficacy of the Program in meeting the City's concern, *Vernonia*, 515 U.S.

10

at 660, and whether the invasion of privacy is calibrated to the defined risk, *Chandler*, 520 U.S. at 321-23.

¶17    The record before us provides little information about the City's reasons for adopting random testing and provides no evidence to explain the City's perceived need to conduct such testing.  As the City conceded at oral argument, the record is devoid of any indication that the City has ever encountered any problem involving drug use by its firefighters.  The record lacks not only evidence of even a single instance of drug use among the firefighters to be tested but also any evidence of accidents, fatalities, injuries, or property damage that can be attributed to drug or alcohol use by the City's firefighters.  No evidence of record suggests that the firefighters asked for or consented to the testing policy, and the record includes not even an allegation or rumor that the City's firefighters used or abused drugs or alcohol.  Based on this record, we detect no real and substantial risk that the public safety is threatened by drug or alcohol use among the firefighters to be tested. The absence of evidence of drug use, at least as reflected in the record, provides no basis for us to conclude that random, suspicionless testing is calibrated to respond to any defined risk.  At most, the Program's random testing

11

component furthers only a generalized, unsubstantiated interest in deterring and detecting a hypothetical drug abuse problem among the City's firefighters.[4]

¶18    Nonetheless, relying primarily upon *Von Raab*, *Vernonia*, and *Earls*, the City asserts that the Supreme Court "has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing." *Earls*, 536 U.S. at 835. The City's argument accurately reflects language from the cases upon which it relies. These cases, however, focused on a number of important factors that differ from the facts of this case and therefore offer limited support for the City's argument.

¶19    In *Von Raab*, the Court examined the constitutionality of a United States Customs Service program requiring Customs Service employees to submit to suspicionless testing upon promotion or transfer to positions directly involved in the interdiction of illegal drugs or positions that required carrying a firearm. 489

---

[4] While we recognize and applaud the City's interest in deterring drug use among firefighters, the Program also requires testing upon reasonable suspicion, after an accident on the job, and following a return to duty or as a follow-up to "a determination that a covered member is in need of assistance." The record before us provides no basis for concluding that these testing

12

U.S. at 660. Although the Customs Service did not adopt its policy in response to a history of drug and alcohol abuse problems, *id.*, the plan was developed for an agency that the Court recognized as "our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population." *Id.* at 668. The Court reasoned that those employees directly involved in drug interdiction or carrying a firearm could jeopardize the agency's "almost unique mission." *Id.* at 674. As a result, the Court concluded that the Customs Service had a compelling interest in assuring that users of illegal drugs would not be placed in these positions. *Id.* at 670-71. In upholding the testing regime, the Court also noted that the testing program provided advance notice of the scheduled sample collection. *Id.* at 672 n.2. In addition, the Court focused on the context in which the Service's testing program was implemented, which the Court described as an environment in which "it is not feasible to subject employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Id.* at 674. Given these particular facts, as the Court later emphatically stated, "[*Von Raab* is]

---

alternatives fail to deter and detect drug use among the City's firefighters.

13

[h]ardly a decision opening broad vistas for suspicionless searches [and it] must be read in its unique context." *Chandler*, 520 U.S. at 321.

¶20    Unlike the Customs Service employees in *Von Raab*, the City's firefighters are not directly involved in drug interdiction, do not carry a firearm, and are not required to use deadly force in the regular course of their duties. In addition, the firefighters' communal work environment provides a better opportunity for supervisors to detect drug use and therefore develop reasonable suspicion to conduct a test under appropriate circumstances. This environment reduces the risk that a firefighter could cause "great human loss before any signs of impairment become noticeable to supervisors or others." *Skinner*, 489 U.S. at 628. Finally, as we discuss below, the element of "fear and surprise" inherent in the Program's random testing procedures results in a broader and more intrusive privacy invasion than did the testing procedures approved in *Von Raab*. *Von Raab*, 489 U.S. at 672 n.2 (noting that the advance notice given of the scheduled sample collection reduces "to a minimum any 'unsettling show of authority'" (quoting *Delaware v. Prouse*, 440 U.S. 648, 657 (1979)).

¶21    *Vernonia* and *Earls* also provide limited support for the City's random testing of its firefighters. In

14

*Vernonia* and *Earls*, the Court upheld school district policies that required students participating in extracurricular activities to submit to random drug tests. *Earls*, 536 U.S. at 838 (finding school district policy, which included random testing of students participating in extracurricular activities, to be constitutional); *Vernonia*, 515 U.S. at 664-65 (upholding school district's policy authorizing random drug testing of students participating in interscholastic athletics). In upholding the policies, the Court emphasized in both decisions that "'Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children.'" *Earls*, 536 U.S. at 829-30 (quoting *Vernonia*, 515 U.S. at 656).

¶22 Firefighters, of course, have little in common with students entrusted to the government's care. As Judge Hall correctly noted, "unlike a public school student['s right to privacy], a firefighter's right to privacy, although limited in some respects, is not inherently 'subject[] to greater controls than those appropriate for adults.'" *Petersen*, 204 Ariz. at 289 ¶ 44, 63 P.3d at 320 (Hall, J., concurring in part and dissenting in part) (quoting *Earls*, 536 U.S. at 831). On this basis alone, we

have little trouble distinguishing *Vernonia* and *Earls* from this case.

¶23    Moreover, unlike the record in this case, the records in both the *Earls* and *Vernonia* actions presented specific evidence of drug use that supported the districts' decisions to institute the testing regimes.  In *Vernonia*, an "immediate crisis," 515 U.S. at 663, brought about by a "sharp increase in drug use," *id.* at 648, sparked installation of the testing program.  Similarly, the *Earls* Court noted that the "School District ha[d] provided sufficient evidence to shore up the need for its testing program."  536 U.S. at 835.

¶24    Given the dearth of evidence by which we can measure the strength of the City's proffered "special need" and the City's failure to articulate how the Program's random testing procedures further its interests, we conclude that the City has failed to define any real and substantial risk that random, suspicionless testing is designed to address.  Nonetheless, because the Supreme Court has stated that a lack of empirical data, by itself, is not fatal to a suspicionless testing program, *Von Raab*, 489 U.S. at 673-75, we now consider the extent of Petersen's acknowledged Fourth Amendment privacy interests and then balance these interests against the City's

16

generalized, unsubstantiated interest in deterring and detecting substance abuse among the City's firefighters.

**B.**

¶25    The collection of urine and breath samples for purposes of drug and alcohol testing "infringes an expectation of privacy that society is prepared to recognize as reasonable." *Skinner*, 489 U.S. at 616. Nevertheless, "'operational realities of the workplace' may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts." *Von Raab*, 489 U.S. at 671 (quoting *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987)). In *Skinner*, for example, the Court found that railway employees' expectation of privacy is "diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." 489 U.S. at 627.

¶26    As was true of the railway employees in *Skinner*, the City's firefighters possess a diminished expectation of privacy. The safety risks associated with becoming a firefighter are well known. We entrust firefighters with protecting both the community at large and their colleagues from danger, while putting their own well-being at great

17

risk of harm. A firefighter's ability to do this job in a safe and effective manner depends, in substantial part, on his or her health and fitness. In addition, a firefighter, while on duty, lives in a communal environment. Given all these factors, we conclude that individuals who elect to become firefighters should anticipate a diminished expectation of privacy and should reasonably expect some intrusion into matters involving their health and fitness.

¶27     The strength of any asserted privacy interest also turns upon the "character of the intrusion." *Vernonia*, 515 U.S. at 658. Although any program that compels urinalysis affects privacy interests, the City has designed its Program to reduce its intrusion upon the firefighters' privacy interests. *See*, *e.g.*, *id.* (concluding that "the degree of intrusion depends upon the manner in which production of the urine sample is monitored"). The Program permits firefighters providing samples to use private bathroom stalls at the designated testing facility, where they are not subject to direct monitoring. The firefighter then gives the sample to an authorized monitor for color and temperature testing. The laboratory confirms any initial positive test by using gas chromatography/mass spectrometry techniques, which reduces the specter of a "false positive" test result. *See*, *e.g.*,

18

Karen Manfield, *Imposing Liability on Drug Testing Laboratories for "False Positives": Getting Around Privity*, 64 U. Chi. L. Rev. 287, 290-92 (1997) (stating that retesting positive results with a properly administered gas chromatography test "would eliminate virtually all the false positives"). The MRO reviews the results and contacts the firefighter on a confidential basis. In addition, the Department does not release testing records outside the Department without the firefighter's consent.

¶28    These procedures, which attempt to guard the firefighters' privacy interests to the extent possible, all work to reduce the intrusiveness of the privacy invasion. Nonetheless, given the random nature of these searches, we cannot conclude that "the privacy interests implicated by the search are minimal." *Skinner*, 489 U.S. at 624.

¶29    The Supreme Court has not examined random testing procedures outside of the unique school setting. *Earls*, 536 U.S. 822; *Vernonia*, 515 U.S. 646. In both *Vernonia* and *Earls*, the Court upheld school district policies requiring students participating in extracurricular activities to submit to random drug testing. In both cases, without directly addressing the privacy implications of a random search, the Court upheld the challenged searches based primarily upon "'the schools' custodial and tutelary

19

responsibility for children.'" *Earls*, 536 U.S. at 829-30 (quoting *Vernonia*, 515 U.S. at 656).

¶30     Outside the school context, the Court has recognized that notification in advance of a scheduled search minimizes the intrusiveness of the search. *Von Raab*, 489 U.S. at 672 n.2; *see also United States v. Martinez-Fuerte*, 428 U.S. 543, 559 (1976) (noting that the intrusion on privacy occasioned by routine checkpoints is minimized by the fact that motorists "are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere"). In *Von Raab*, for example, the Court identified the advance notice given as a factor in upholding the suspicionless testing of Customs Service employees. 489 U.S. at 672 n.2. The *Von Raab* Court stated:

> Only employees who have been tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions. Employees are also notified in advance of the scheduled sample collection, thus reducing to a minimum any "unsettling show of authority" that may be associated with unexpected intrusions on privacy.

*Id.* (quoting *Delaware*, 440 U.S. at 657).

¶31     Consistent with the Court's statements in *Von Raab*, a number of federal and state courts have

20

acknowledged the increased privacy concerns occasioned by random testing. *See*, *e.g.*, *Bluestein v. Skinner*, 908 F.2d 451, 456-57 (9th Cir. 1990) (finding the fact that the challenged testing program provided for unannounced and random tests added "some weight to the 'invasion of privacy' side of the Fourth Amendment balance"); *Harmon v. Thornburgh*, 878 F.2d 484, 489 (D.C. Cir. 1989) ("Certainly the random nature of the . . . testing plan is a *relevant* consideration; and, in a particularly close case, it is possible that this factor would tip the scales."); *Anchorage Police Dep't Employees Ass'n v. Municipality of Anchorage*, 24 P.3d 547 (Alaska 2001). In *Anchorage*, for example, the Alaska Supreme Court, relying upon the Alaska Constitution, concluded that the random testing of firefighters is qualitatively different from suspicionless testing that occurs prior to employment, upon promotion, demotion or transfer, and after a traffic accident. *Anchorage*, 24 P.3d at 557. The court reasoned:

> Because the policy's provision for random testing could subject employees to "unannounced" probing throughout the course of their employment, the tests are peculiarly capable of being viewed as "unexpected intrusions on privacy." For example, it might seem manifestly unreasonable for any person applying for a safety-sensitive position in a heavily regulated field of activity not to anticipate—and implicitly agree to—a probing inquiry into the applicant's capacity to perform job-related duties; the same would hold true for

> any employee who might be promoted, demoted, transferred, or become involved in a job-related accident. But a job applicant or employee who anticipated such inquiries might nevertheless expect not to be subjected to a continuous and unrelenting government scrutiny that exposes the employee to unannounced testing at virtually any time. Such expectations cannot be so readily dismissed as patently unreasonable.

*Id.* at 557-58 (citations omitted).

¶**32**     Although the Alaska Supreme Court analyzed the Anchorage plan under its state constitution, we find the court's reasoning about the difference between random and announced or scheduled tests persuasive. The very nature of random, suspicionless searches precludes any advance notification and subjects employees to continuous government scrutiny. Random testing, therefore, necessarily raises the specter of the "'unsettling show of authority' that may be associated with unexpected intrusions on privacy." *Von Rabb*, 489 U.S. at 672 n.2 (quoting *Delaware*, 440 U.S. at 657). Accordingly, we conclude that random, suspicionless drug testing, while not *per se* unreasonable, invades reasonable privacy interests even when the government collects the urine sample in a relatively unintrusive manner and takes steps to protect employees' privacy interests by limiting the information that is disclosed.

22

¶33    Balancing Petersen's privacy interests against the interests the City advances in favor of the Program's random component, we conclude that the City's generalized and unsubstantiated interest in deterring and detecting alcohol and drug use among the City's firefighters by conducting random drug tests is insufficient to overcome even the lessened privacy interests of the firefighters in this case.   The situation we consider, on this record, cannot be described as one of the "limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, [and in which] a search may be reasonable despite the absence of such suspicion."   *Skinner*, 489 U.S. at 624.    Rather, the increased intrusion occasioned by the Program's random, suspicionless testing component represents the very type of "arbitrary and invasive acts by officers of the Government or those acting at their direction" against which the Fourth Amendment is meant to guard.   *Id.* at 613-14.   We therefore hold, on the record before us, that the Program's random component falls outside the "closely guarded category of constitutionally permissible suspicionless

searches," *Chandler*, 520 U.S. at 309, and violates the Fourth Amendment to the United States Constitution.

## IV.

**¶34** For the foregoing reasons, we vacate the court of appeals' opinion and affirm the trial court's judgment enjoining the City from enforcing the random, suspicionless component of the Program.

_____
Ruth V. McGregor, Vice Chief Justice

CONCURRING:

_____
Charles E. Jones, Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

24